[No. 6883. Decided March 12, 1908.]

MABLE OLMSTEAD, *Respondent*, v. HASTINGS SHINGLE MANUFACTURING COMPANY, *Appellant*.[1]

MASTER AND SERVANT—NEGLIGENCE—CAUSE OF INJURY—EVIDENCE—SUFFICIENCY. In an action for the death of an operator of a shingle saw, a verdict for the plaintiff cannot be sustained, and should have been directed for the defendant, where it appears from the evidence that no one saw the accident, that the deceased had evidently fallen on the saw, where his body was found badly cut, and his fall upon the saw might have happened in a number of ways, and there was no substantial basis for the theory that the accident was due to the negligence of the defendant; since the jury would have to guess as to the cause.

[1]Reported in 94 Pac. 474.

Appeal from a judgment of the superior court for Whatcom county, Neterer, J., entered January 16, 1907, upon the verdict of a jury rendered in favor of the plaintiff, in an action for damages for the death of a sawyer employed in a shingle mill. Reversed.

*Newman & Howard,* for appellant.

*Findley & Welch, H. M. White,* and *R. W. Greene,* for respondent.

MOUNT, J.—This action was brought by respondent, Mable Olmstead, in her own behalf and as guardian of her two minor children, to recover damages on account of the death of her husband, H. M. Olmstead, alleged to have been caused by negligence of the appellant. The defense was a denial of negligence, an allegation of assumption of risk, contributory negligence of the deceased, and settlement between appellant and respondent. On these issues the cause was tried to the court and a jury, resulting in a verdict and judgment for the respondent in the sum of $10,000. The defendant appeals and assigns numerous errors, one of which is that the trial court, upon the undisputed facts, should have directed the jury to return a verdict in favor of the defendant.

The facts, so far as they relate to the injury and the negligence of the appellant, are substantially these: For twelve days prior to the 19th day of February, 1903, the deceased, H. M. Olmstead, had been employed as a sawyer in the shingle mill of appellant at Wahl Station in Whatcom county. For about one year previous to that time the deceased had been employed about the mill in different capacities, part of the time as engineer and fireman, part of the time as packer, and filing and hammering saws, and part of the time as extra man at the saws. He had been employed for one hundred and fifty-six days out of nearly a year, prior to the accident hereinafter mentioned. During the twelve days he was employed as regular sawyer at one of the shingle machines as above stated,

his work was at night. The place was lighted by an electric lamp which hung immediately above his head. The shingle machine at which deceased worked was known as a "Letson & Burpee upright shingle" machine. It was of standard make, with one exception which will be stated hereafter. It consisted of two circular saws about thirty inches in diameter, one of which was at the left of the operator and cut the shingles automatically from a block and dropped them onto a table. This saw was known as the "shingle" saw. The other saw was immediately in front of the operator and known as the "jointer" saw. This jointer saw was stationary in a table about thirty inches in height, and extended through a slot in the top of the table about five to six inches above the plane of the table. A spring board was attached to the table at the left near the shingle saw, and extended in front over the jointer saw between the operator and the saw. In jointing shingles the operator would place a shingle on top of this spring board over the saw, and then press the board down, carrying the shingle onto the saw which trimmed off the edges of the shingles and otherwise made the finished product. A shaft or arbor of the shingle saw extended across the top of this table, and lengthwise of it, about eight inches behind the jointer saw, and parallel with it. The top of the jointer saw was three feet above the floor and a little higher than the arbor or shaft of the shingle saw. A shingle chute was in front of the operator over the jointer table, above the arbor of the shingle saw. Shingles after being jointed were tossed by the operator into this chute directly in front of him, good shingles to the left and culls to the right. These shingles slid down the chute to the floor below. On the arbor of the shingle saw and to the right of the operator, a pulley was attached around the arbor of the shingle saw. This pulley was not made by the manufacturers of the machine, but was constructed by the appellant of old belting, one-half inch in thickness and about eight inches wide, wrapped twice around the arbor and laced with lacing; and also at the edge toward the saw a clamp of iron,

about one inch wide and one-fourth of an inch thick, was placed over this belting. The ends of the clamp were bent at right angles to the arbor, and a small bolt placed through the ends so as to clamp the belt pulley tightly to the arbor and prevent the pulley from slipping on the arbor. The ends of this clamp projected at right angles to the arbor about an inch or an inch and a half. The end of the small bolt also projected from the jaws of the clamp. A belt ran over this pulley between the clamp and the box at the end of the arbor, and covered all the space between the clamp and the box. This clamp and pulley belt were just below the floor of the shingle chute above mentioned, and barely cleared it as the arbor revolved. This pulley was not a part of the machine as manufactured, and was placed there for the purpose of causing the shingle saw feed to run more rapidly. Shingles and culls frequently accumulated or "swamped up" on the chute leading to the lower floor of the mill, and the customary way to free the chute of this "swamp" was for the operator to push the accumulation down with a shingle held in his right hand. In pushing an accumulation of the culls, the hand of the operator would come near the revolving clamp. He would not have his hand near this clamp for any other purpose.

As stated, the deceased had operated this machine regularly for twelve days on a night shift. It was his duty to keep the machine in order by oiling it often, and to change one of the saws about every two hours and the other about every four hours. On the night of February 19, 1903, he went on duty about seven o'clock p. m. He was killed at 1:30 o'clock that night by the jointer saw, about thirty minutes after he had gone to work after his midnight meal. No one saw the accident or how deceased happened to come in contact with the saw. The last seen of him alive was when he was standing in front of the jointer saw smoking his pipe. About a minute or two afterwards a noise was heard by the engineer and other employees, a cloud of dust arose around the machine, and the engineer, thinking something was wrong, ran to his engine and

stopped the machinery. The deceased was then found lying dead on the jointer saw. A part of his clothing was wrapped around the clamp and on the arbor, a cut extended from near his backbone round to the right side up into his chest in front where the saw stopped. The jointer saw was in his body, and he was lying on the spring board, face downward, with his chin near the base of the spring board. Part of his shirt and jumper was torn off and wrapped around the clamp and arbor of the shingle saw. The index finger of his right hand was cut off through the large knuckle. His right arm had been cut nearly off close to the body by the saw, and the arm was between the jointer saw and the arbor. The clothing was attached to the clamp and arbor and had to be cut before the body could be removed. After the accident there were no shingles on the chute in front of the machine, but there were some shingles below in the bin.

The respondent contends, that the clamp, with its projections from the arbor of the shingle saw in close proximity to the shingle chute where deceased was required to work and where he was frequently required to remove accumulations, rendered the place unsafe; that appellant knew of the dangerous character of the place and was therefore guilty of negligence in maintaining the said clamp with such projection. The theory of respondent as to how the accident happened is, that a pile of the shingles had accumulated in the cull chute; that deceased undertook with a shingle to remove the same, and while so doing the sleeves of his shirt and jumper were caught by the projection on the arbor and threw the deceased into the saw. The appellant, on the other hand, contends that the place was reasonably safe; that the deceased had full knowledge of the dangers, which were open and apparent, and therefore assumed the risk; that if the appellant were negligent in maintaining the clamp as stated, the evidence fails to show that such negligence was the cause of the injury; that there is no evidence that the deceased was caught either by the revolving arbor or the projecting clamp, and thereby drawn onto the saw.

It is not necessary for us to discuss any other point than the one last mentioned. The only evidence that the deceased came in contact with the projection on the clamp and was thereby drawn into the saw is the fact that, after his death, some of his clothing was wound around the arbor and this clamp. Whether this occurred before his death or afterwards does not appear. There is no evidence whatever to show that his clothes were caught in the clamp before he came in contact with the saw. The machinery was in motion for a short time after his death, and it is as reasonable to suppose that the clothing was caught by the clamp and wound around the shaft after death as before. In fact, if the clothing of the deceased was caught by the revolving arbor before he was killed, the clothing must have been torn loose from the body in an instant, because this arbor revolved rapidly, the power was necessarily great, and naturally in less than a second of time the clothing would have been stripped from the arm, or the arm itself wrapped around the arbor. Such was not the result. After the machine was stopped the clothing of deceased was still attached both to the arbor and to his arm, thus showing that the clothing became attached to the arbor just about the time the motion of the machinery was stopped. It is shown that the shingles frequently swamped on the chute, and that then it was customary for the deceased to remove them by shoving them down by means of a shingle held in his right hand, which then came close to this clamp; that unless the shingles were so swamped, the operator had no occasion to come in contact with the clamp on the arbor. There was no evidence to show that, prior to the injury, any swamp had occurred in the chute. It was, therefore, not shown to be necessary for deceased to have his hand or his clothing near the clamp.

It is argued that, because no shingles were found in the chute immediately after the accident, this shows that the deceased had cleared the chute immediately prior thereto. This does not follow as of course, because these accumulations of

shingles were not of constant occurrence. They occurred several times during the day. They were visible and could have been seen as readily as any other object. Deceased had worked about thirty minutes after his midnight meal. No swamp was noticed prior to this time. When a swamp was pushed down, there must have been some evidence of that fact which would have been known or heard by the packer below, even though he might have been working at another bin at that time. There was no evidence of any of these facts tending to show that there was a swamp of shingles on the chute at the time of the accident.

Before it can be assumed that the clothing of the deceased came in contact with the clamp prior to his death, some fact must be made to appear which shows a duty to get near the clamp. The only reason offered is that there was a swamp of shingles in the chute at the time. This reason fails in this case because it is not shown that there was any such swamp, or any circumstance indicating a swamp at that time. The cause of death, therefore, is not shown to be the result of negligence on the part of the appellant, even though the appellant were held to be negligent in maintaining the clamp on the arbor of the shingle saw. There is no statutory liability in this case because the accident happened prior to the passage of the factory act of 1903 (Laws 1903, p. 40). The liability, if any, is a common law liability. The accident in this case might have happened in a number of ways for which the defendant was not responsible. For example, the deceased might have fallen on the saw by his own carelessness; he may have been stricken by dizziness; he may have cut his finger off and then fallen on the saw by reason thereof. A number of such theories are advanced. Any of these may be true. The theory advanced by the respondent may be true, but before that theory can be submitted to the jury the evidence must show a satisfactory foundation therefor, and not leave it to the jury to guess between causes for which the defendant would and would not be liable. *Peterson v. Union Iron Works,* *ante* p. 505, 93 Pac. 1077, and cases there cited.

Upon a careful consideration of all the evidence, we are convinced that there is no substantial basis for the claim that the deceased came in contact with the clamp prior to his death, or that there was any evidence to submit to the jury that the cause of death was due to negligence of the appellant. It was, therefore, the duty of the trial court to sustain the motion of appellant for a directed verdict. The judgment must therefore be reversed, and the cause dismissed.

HADLEY, C. J., CROW, ROOT, and RUDKIN, JJ., concur.