[No. 4542. Decided October 13, 1903.]

LYDIA H. REIDHEAD *et al., Respondents,* v. SKAGIT COUNTY, *Appellant.*[1]

NEGLIGENCE—BRIDGES—LACK OF GUARDRAILS—DEATH BY WRONGFUL ACT—PROOF OF CAUSE OF DEATH—FAILURE OF PROOF—VERDICT NOT SUSTAINED WHEN BASED ON CONJECTURE. In an action for the death of a person alleged to have fallen from a bridge negligently maintained without any guardrails, there is a total failure of proof as to the cause of the death, and a verdict for plaintiffs is not warranted where it appears that the deceased left his team standing in the road the evening before to return some distance for a whiffletree, that the team wandered from the road down the stream without crossing the bridge, that deceased's body was found partly underneath the bridge up the stream, and the whiffletree four feet further up the stream, that deceased was familiar with the bridge, and that a person could approach the stream above the bridge and walk in the ravine beneath the same; since it is equally plausible and consistent with the testimony that he met his death other than by falling from the bridge, and the same cannot be left to conjecture or speculation.

Appeal from a judgment of the superior court for Skagit county, Joiner, J., entered upon a verdict of a jury

[1]Reported in 73 Pac. 1118.

rendered June 16, 1902, in favor of plaintiffs, for $1,000 for damages for the death of Andrew P. Reidhead, attributed to the lack of guardrails on a county bridge. Reversed.

*M. P. Hurd,* for appellant.

*Gable & Seabury* and *Million & Houser,* for respondents.

PER CURIAM.—This action was begun in the superior court of Skagit county by Lydia H. Reidhead and Vina C. Reidhead, a minor, by her guardian, against Skagit county, for the purpose of recovering damages for the death of Andrew Pearl Reidhead, alleged to have been caused by the negligence of the county. The negligence, as set out in the complaint, was that the county had constructed and maintained a bridge on a public highway without providing guardrails or other proper protection along the sides of the structure, whereby the deceased fell from the said bridge to the bottom of the ravine below, the same causing his death. The answer denied the material allegations of the complaint and set up an affirmative defense of contributory negligence. The allegations of contributory negligence were in turn denied in the reply.

The following statement substantially embraces the material facts as shown by the evidence. The bridge in question, at the time of the alleged accident, was a wooden structure about thirty feet in length by fifteen feet in width. The floor was twelve feet wide and consisted of cedar puncheons, held in place by logs or sticks of timber about nine or ten inches in diameter laid on each side of the structure, fastened with pins or spikes. The distance between banks at the top of bridge was about seventeen feet. Underneath, about eight or nine feet below, near

the center, there flowed a small stream about five and one-half feet in width, emptying into the Skagit river a few rods below. The water was cold and ran quite rapidly, causing a rippling sound that might, under ordinary conditions, be heard for three or four rods. Just above, on the upper side, north of the bridge, two small streams came together, forming one creek. Between the two streams at that place there was a small wedge shaped sand bar, coming to a point about two or three feet from the bridge. It sloped northwards twenty or twenty-five feet. This bridge was a substantial structure suitable for ordinary travel for teams and pedestrians. It had been maintained for a number of years, and was then a part of the county road leading from Hamilton to Baker river. It had no guardrails on either side.

The evidence showed, that deceased was sixty years of age; that he left his home at Hamilton about four o'clock in the afternoon of August 19, 1901, taking along with him his team, harness, and some logging apparatus, with the intention of going to work for a mill company on Baker river; that, in order to reach his destination, it was necessary for him to travel along this road; that about dusk on the same evening deceased, with his team and logging outfit, arrived at the place of John R. Kearney, located on the county road on the north side of Skagit river; that the bridge in question was about 300 yards distant from Kearney's, between his place and Baker river, which was about 2¼ miles beyond on said road; that deceased remained at Kearney's, fed his team, obtained something to eat for himself, departed with his horses and outfit about nine or ten o'clock on that evening, going in the direction of the bridge. In about twenty-five minutes he returned without his team, in search of a whiffletree which he had left

behind, and which he found with the assistance of Mr. Kearney, who went with him for a short distance along the main road towards the bridge; that, before separating, Kearney asked deceased where he had left his team, and was told that they were left standing in the road. Kearney was the last person who saw Reidhead alive.

Early on the following morning one of the horses returned to Kearney's premises, dripping wet, whereupon Kearney, with assistance, went in search of the place where the horses reached the river. This place he found, a short distance below near a drift, where he also found the other horse. Mr. Kearney testified, that the horses did not go over the bridge; that they went from the road into the Skagit river; that the deceased had worked for him for about a couple of weeks, and was familiar with the bridge; that a diligent search was made by witness, with other parties, which was for the most part directed towards the river; that twelve or fifteen feet above the bridge there is a beach, where the creek may be approached with teams; that a person at that time could walk up the ravine under the bridge; that about the 25th of August following, witness was informed that some trappers had found a body near the bridge. The facts concerning the finding of the body are narrated by the witness Kearney in his direct examination as follows:

"Q. Where did you see the body; where was it lying? A. Above the bridge with his feet toward the northeast. The singletree he had with him, that he came back for, was lying three or four feet still further up the stream in the direction of his feet. He was lying with the upper part of his person under the bridge. Q. With his head and shoulders under the bridge? A. Yes, sir. Q. How high is that bridge? A. Between nine and ten feet. Q. Were there any indications that the body had been a corpse for several days? A. Yes, sir. But I think it was the best

preserved body for the length of time it laid that I ever saw. The water was cold as ice, and it ran swift and washed the wounds off. Q. Were there any bruises on him? A. On the left side of the cheek he had a deep gash cut, and another here (indicating) not so deep. They were three or four inches apart."

There was some testimony tending to show that the wounds resembled scratches. A. W. Swain, justice of the peace, who held the inquest, testified in reference to the position of the body when he first saw it, in the following language:

"He was lying on the upper side of the bridge, on the north side of the bridge. The bridge runs east and west— just above the stream at least, on his back with his head down stream and his feet up stream. There was a bar formed just above the bridge, and part of his body was lying up on that bar, and his head lying in the water, and the water was running over his head to his ears. I don't know whether it had been any higher or not."

There was some testimony showing that near that spot there were some tin cans and small rocks, or gravel, but the bar was composed mostly of sand. After the evidence on behalf of respondents was submitted, appellant moved the trial court to direct a nonsuit in its favor, for the reason, among others, that it was not shown that Reidhead's death was caused by any negligence on the part of the county. The motion was denied, and exception taken. After hearing the evidence and instructions of the court, the jury returned a verdict for $1,000 damages in favor of respondents. A motion for a new trial was made by appellant, which was overruled by the trial court, and judgment was rendered on the verdict. Defendant appeals, and alleges several grounds of error; the principal contention being insufficiency of the evidence to justify the verdict, and that the verdict is against law.

The vital question in this case is whether there was any evidence adduced at the trial to sustain the verdict.   In our opinion, the respondents failed to furnish or produce any evidence tending to show that the deceased fell from the bridge in question, or even that he was at or on the structure after he left Kearney's place on the evening of the 19th of August, 1901.   Ordinarily it would seem strange that a man in possession of his faculties, familiar with the situation, should deliberately walk upon a structure such as is described in the testimony, and then fall or tumble off to the bottom of the gulch below.   We think the case at bar falls squarely within the rule laid down by the decision of this court in *Armstrong v. Town of Cosmopolis*, 32 Wash. 110, 72 Pac. 1038, which was in many respects similar to the case at bar, in which the following language is used:

"But while it is true that the weight of the testimony is entirely for the jury, yet mere speculation and conjecture must not be confused with legitimate testimony. There are many theories which might be advanced, which would be mere guessing, that would be as reasonable as the theory contended for by appellants."

So in the present controversy, the deceased might have met his death in any one of several different ways, wherein the conclusion is equally as plausible and consistent with the testimony as are the contentions of respondents. The deceased might have gone down the embankment into the ravine, stumbled, and fallen into the creek in the darkness of the night, in the search for his horses.   He might have met his death by violence, and the perpetrator might have placed the body there with the whiffletree, to make it appear that he had fallen from the bridge.   We might go on theorizing as to the cause of his death, and arrive at the point from which we started.   This unfortunate af-

fair is enveloped in mystery.    We cannot ascertain the
cause of the death, or see how any jury could consistently
ascertain it from the testimony produced in the superior
court.    A jury's verdict must be founded on evidence.
It is within their province to decide as to the weight, or
preponderance of testimony, under proper instructions of
the court.    But when there is a total failure of proof as to
a material and controverted allegation, a jury has no right
to speculate thereon.

The case of *Armstrong v. Town of Cosmopolis, supra,* is
amply sustained by the decisions of other courts.    In *Hyer
v. Janesville,* 101 Wis. 371, 77 N. W. 729, which was
an action to recover compensation for personal injuries,
the court, in its opinion at pages 376-7, uses the following
forcible language:

"It has been said by this and other courts repeatedly,
and is the established law, that a jury cannot properly be
allowed to determine disputed questions of fact from mere
conjecture.    There must be some direct evidence of the
fact, or evidence tending to establish circumstances from
which a jury would be warranted in saying that the infer-
ences therefrom clearly preponderate in favor of the exist-
ence of the fact, else the question should not go to the jury
for determination at all.    To allow a jury to reach a con-
clusion in favor of the party on whom the burden of proof
rests, by merely theorizing and conjecturing, will not do.
There must at least be sufficient evidence to remove the
question from the realms of mere conjecture, else the trial
court should pronounce the judgment of the law on the
situation by taking the case from the jury when requested
so to do."

*Patton v. Texas & Pacific R. Co.,* 179 U. S. 658, 21 Sup.
Ct. 275; *Philadelphia & Reading R. Co.. v. Schertle,* 97
Pa. St. 450.

Misfortunes often happen through causes which cannot
be ascertained.    Human laws and institutions cannot cor-

rect every wrong, or afford compensation for every loss or affliction.   To uphold a verdict of the jury in a civil cause when there is no evidence to justify it, is not administration of justice, but the deliberate taking of the money or property of one party and transferring it to another.

Tested by the rules of law above stated, we reach the conclusion that the trial court erred in not granting appellant's motion for a nonsuit.   The judgment of the superior court is therefore reversed, with directions to dismiss the action.