## ST. LOUIS, I. M. & S. RY. CO. v. CONLEY.

(Circuit Court of Appeals, Eighth Circuit. April 11, 1911.)

### No. 3,465.

1. COURTS (§ 489*)—MASTER AND SERVANT (§ 87*)—EMPLOYER'S LIABILITY ACT —JURISDICTION TO ENFORCE—STATE COURTS.

The federal employer's liability act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1909, p. 1171]) is remedial in character, and should be so construed as to prevent the mischief and advance the remedy, and an action based thereon may be maintained either in the state or federal courts.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 489;* Master and Servant, Dec. Dig. § 87.*]

2. COMMERCE (§ 58*)—CONSTITUTIONAL LAW (§ 301*)—MASTER AND SERVANT (§ 11*)—EMPLOYER'S LIABILITY ACT—DUE PROCESS OF LAW.

Employer's Liability Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1909, p. 1171), which applies only to the relations between railroad companies engaged in interstate commerce and their employés in such commerce, is not unconstitutional, as not within the power of Congress under the commerce clause of the Constitution, nor as depriving railroad companies of their property or liberty to contract without due process of law, in violation of the fifth amendment.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 58;* Constitutional Law, Dec. Dig. § 301;* Master and Servant, Dec. Dig. § 11.*]

3. MASTER AND SERVANT (§ 113*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—STRUCTURES NEAR RAILROAD TRACK.

Where it is possible to do so, a railroad company is required to place structures at such distance from the track that they will not endanger

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

its servants in operating trains; and it is liable for an injury to an employé while in discharge of his duty, which occurs without fault on his part from a structure which is placed unnecessarily close to the track.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 224–227; Dec. Dig. § 113.*]

4. MASTER AND SERVANT (§§ 288, 289*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Plaintiff's intestate, who was engineer on a freight train on defendant's railroad, was killed while passing through a long tunnel by striking his head against a batter post standing beside the track supporting the arch of the tunnel. The width of the engine cab was 10 feet, and the clearance between the posts 13 feet. The posts originally had been 15 feet apart, but in reinforcing the roof, posts had been placed a foot nearer the track on each side. There was evidence showing that they could have been placed 6 inches further away without additional cost and a foot further away at a small cost. It was shown that the track in the tunnel was rough, and that by reason of the swaying of the engine and the darkness it was impossible for an engineer, in passing through, to ascertain the distance of the posts from the track with any degree of accuracy. It was also shown that the injector on the engine had become broken, and that deceased was working at it, and that to see if it was working properly it was necessary to put his head out of the window. *Held,* that it could not be said as matter of law that he knew of the danger and assumed the risk, or was chargeable with contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1072, 1110; Dec. Dig. §§ 288, 289.*]

In Error to the Circuit Court of the United States for the Western District of Arkansas.

Action at law by Mamie Conley, administratrix of the estate of Thomas Conley, deceased, against the St. Louis, Iron Mountain & Southern Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

W. E. Hemingway, for plaintiff in error.

T. M. Seawel (A. C. Seawell, G. J. Crump, D. S. Mayhew, and O. T. Hamlin, on the brief), for defendant in error.

Before HOOK, Circuit Judge, and RINER and Wm. H. MUNGER, District Judges.

RINER, District Judge. This was an action at law, brought by the defendant in error, hereafter called the plaintiff, against the St. Louis, Iron Mountain & Southern Railway Company, plaintiff in error, hereafter called the defendant, to recover damages for the death of her husband, alleged to have been caused by the negligence of the defendant. The case was originally brought in the state court, and removed to the Circuit Court for the Western District of Arkansas by the defendant. The plaintiff filed a motion to remand, which was overruled. It was suggested at the argument, and again by the plaintiff in her brief, that the motion to remand should have been sustained; but, as the present writ of error presents only the assignments of error made by the defendant, the suggestion cannot, of course, be considered.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[1] Before answering in the case, the defendant filed a motion in the Circuit Court to dismiss the case, on the ground that the action was based upon the act of Congress, approved April 22, 1908, "generally known as the Employer's Liability Act"; that the federal courts have exclusive jurisdiction of causes of action arising under this statute; and that the circuit court of Marion county, Ark., therefore, had no jurisdiction of the case, and the Circuit Court, by the removal, acquired no more jurisdiction than the state court had at the time of removal. This motion was overruled, and is one of the assignments of error relied upon.

We think the motion was properly denied. The statute is remedial in its character, and it should be so construed as to prevent the mischief and advance the remedy, and may be enforced either in the state or federal courts. Leggett v. Railway (C. C.) 180 Fed. 314; Nelson v. Railway (C. C.) 172 Fed. 478; Dennick v. Railway, 103 U. S. 11, 26 L. Ed. 439; Potter's Dwarris on Statutes, 234; Brady v. Daly, 175 U. S. 156, 20 Sup. Ct. 62, 44 L. Ed. 109.

[2] The defendant then demurred to the complaint upon two grounds. First, because the act of Congress of April, 1908, is unconstitutional and void, in that it does not come within the power granted to Congress to regulate commerce between the states, since it is an attempt to regulate the relations between employers engaged therein and employés, and not to regulate commerce itself; second, because it seeks to deprive the defendant of the liberty and privilege of making contracts with its employés in the reasonable and necessary prosecution of its business, and to impose upon it liabilities that are unreasonable and not within the terms of its contracts with its employés, and thereby to deprive it of its liberty to make contracts, and of its property, without due process of law. The demurrer was overruled, and this ruling of the court is assigned for error.

It is alleged in the complaint, and also established by the evidence, that Conley, at the time he received the injuries which resulted in his death, was actively engaged in interstate service; that he was an engineer on a freight train running from Crane, Mo., to Cotter, Ark. In considering the act of 1906 (Act June 11, 1906, c. 3073, 34 Stat. 232 [U. S. Comp. St. Supp. 1909, p. 1148]), in the Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297, the Supreme Court sustained the authority of Congress, under its power to regulate interstate commerce, to prescribe the rule of liability as between interstate carriers and their employés in such interstate commerce in cases of personal injuries received by employés while actually engaged in such commerce, basing its conclusions, as we understand the case, on the ground that a rule of that character would have direct reference to the conduct of interstate commerce, and would therefore be within the power of Congress to establish. But as the act included, not only this class of employés, but all employés, many of whom were not actually engaged in the movement of interstate commerce, it was held that Congress had exceeded the power conferred upon it by the commerce clause of the Constitution. The act of 1908 provides that every common carrier by railroad, while engaged in interstate com-

merce, shall "be liable in damages to any person suffering injury while he is employed by such carrier in such commerce," or in case of the death of such employé, "resulting in whole or in part from the negligence of any of the officers, agents or employés of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharfs or other equipment."

This statute is in derogation of the common law, and it must be conceded that such statutes are to be construed strictly; but, as suggested by Chief Justice Parker in Gibson v. Jenney, 15 Mass. 205, "they are also to be construed sensibly and with a view to the object aimed at by the Legislature." The primary object of the act was to promote the safety of employés of railroads while actively engaged in the movement of interstate commerce, and is well calculated to subserve the interests of such commerce by affording such protection; there being, as it seems to us, a substantial connection between the object sought to be attained by the act and the means provided to accomplish that object.

In Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832, the Supreme Court, referring to the fourteenth amendment, said:

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436.

But this freedom of contract has always been recognized as a qualified, and not as an absolute, right. In Railway Company v. McGuire, 219 U. S. 549, 31 Sup. Ct. 259, 55 L. Ed. ——, the Supreme Court, speaking through Mr. Justice Hughes, said:

"The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. Crowley v. Christensen, 137 U. S. 89 [11 Sup. Ct. 13, 34 L. Ed. 620]; Jacobson v. Massachusetts, 197 U. S. 11 [25 Sup. Ct. 358, 49 L. Ed. 643]."

In Frisbie v. United States, 157 U. S. 165, 15 Sup. Ct. 588, 39 L. Ed. 657, the court said:

"It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence; and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

Numerous instances falling within the rule above stated might be cited. Thus, if Congress may require the use of safety appliances, it may prohibit agreements to dispense with them. If it may restrict employment in any service to eight hours a day, it may make contracts for longer service unlawful. The rule is, where the regulation is valid, that is, not being arbitrary or unrelated to a proper purpose, Congress may prevent it from being nullified by prohibitive contracts. In all such cases of interference with the right to contract, it has been held to be "incidental to the main object of the regulation, and, if the power exists to accomplish the latter, the interference is justified as an aid to its exercise." Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.

We think the demurrer was properly overruled.

The defendant then answered, and the case was brought on for trial, resulting in a verdict in favor of the plaintiff.

It is averred in the complaint that the defendant is a corporation organized and existing under and by virtue of the laws of the state of Arkansas, and owns and operates a line of railroad extending from Newport, Ark., to Carthage, Mo., and known as the "White River Branch"; that Conley, the deceased, was, on the 30th day of September, 1909, in the employ of the defendant as an engineer on a freight train running from Crane, Mo., to Cotter, Ark., which train was engaged in commerce between the state of Arkansas and the state of Missouri. It is then alleged that a short distance south of Crickett, Ark., the defendant constructed a tunnel, known as "Crickett Tunnel," through which its road extends; that near the center of the tunnel the defendant negligently and carelessly erected and maintained upright posts of timber, known as "batter posts," so near and within such close proximity to defendant's track that they rendered the operation of its engines and trains over the track at such place hazardous, unsafe, and dangerous to its employés while in the discharge of their duty; that the condition of the tunnel was known to defendant, and not known to Conley; that on the date above mentioned Conley was in the discharge of his duties as engineer of a freight train, and while the engine was passing the upright timbers, or "batter posts," he was struck upon his head by one of them, on account of the negligence and carelessness of the defendant, and by reason of the upright timbers being too close and within dangerous proximity to the track; that he received injuries resulting in his death.

Defendant in its answer (1) denies that it was negligent in the respects charged in the complaint, and (2) avers that Conley had notice of the exact conditions and full knowledge of the location of the posts, and that he thereby assumed all risk of injury that might develop from the location of the posts; (3) that the act of Congress of 1908 violates the fifth amendment to the Constitution of the United States, if it in any way modifies or changes the obligation of the parties as established by contract; (4) that the timbers in the tunnel were so placed as to admit the passage of engines and trains through the tunnel with safety to all employés, if the rules and orders with reference to operating defendant's engines were observed; (5) that Conley

unnecessarily, carelessly, and negligently exposed himself to danger, and that his injury was due solely to this unnecessary, careless, and hazardous exposure of himself to danger.

There is no conflict in the evidence as to the time, place, and cause of Conley's death. The tunnel was, as the record shows, 3,037 feet in length. It had been constructed and in use for some five years prior to the date of the accident. The walls of the west, or Missouri, end of the tunnel for 500 feet were supported on a concrete floor built on piles; then for 117 feet the arch consisted of timber supported by a rock ledge; from that point for some distance the roof was not arched; then came another section of the tunnel, still further east, which was concreted, and still further on to the east it was timbered at some places and at others left as a rock surface. In February, 1909, there was a caving of the roof of the tunnel near the west end, at a place where the roof was not arched. After the removal of the débris the roof was arched at the point where the caving occurred, and at two other places, the arch being supported by upright or "batter posts," as they are referred to in the record. The first set of timbers were placed in the tunnel about 580 feet from the west end, another set was placed 160 feet further east, and still another set 200 feet east of the second set, making the last set of timbers about 940 feet from the west end of the tunnel and 2,197 feet from the east, or Arkansas, end of the tunnel. The record shows that the tunnel curves to the south at the east end, beyond the last set of timbers, and that Conley was killed by his head coming into contact with the first or west post of the last set of timbers. At this place the roof of the tunnel, as originally constructed, was arched with seven segments of timber, which had become decayed, and, after the caving of the tunnel at the other place, defendant constructed a wooden arch of five segments of timber underneath the original arch at the place of injury to the deceased, and these rested upon 12x14 oak wall plates, supported by 13 upright timbers 12x12 and 16 feet in length. The original clearance of the tunnel was 15 feet. After these timbers were placed, the clearance was reduced to 13 feet. There was a conflict in the evidence as to the necessity for reducing the clearance.

Without reviewing in detail the evidence of the several witnesses, we think it was clearly shown that these posts could have been set back at least 6 inches on either side of the track, giving a foot more clearance, without affecting the safety of the tunnel or doing any additional work, and at very slight expense could have been put back at least a foot on each side, thus making it possible for employés operating trains to do so with little, if any, danger. It was also testified that these posts were not in line, varying from 2 to 3 inches toward the track. There was testimony tending to show that a bulletin had been posted in which the clearance of the tunnel was stated to be 11 feet, and that it was the duty of the engineer to familiarize himself with this bulletin. The bulletin, however, as the record shows, referred only to the loading of cars so that the load, such as lumber, would not project more than 11 feet from side to side, and did not give the correct clearance of the tunnel. That the bulletin could not have been

intended for the information of the engineer is perfectly apparent. The evidence shows that the cab was 10 feet in width, which would allow but 6 inches on either side, according to the clearance stated in the bulletin. The evidence further shows that the track was rough, and that the engine would sway from one side to the other more than that distance, and it would therefore be impossible to operate a train through a tunnel with only an 11-foot clearance. The evidence further shows that immediately before entering the tunnel the deceased was working at the injector, a mechanical device for conducting water from the tank to the boiler; that after the train had passed through the tunnel, upon examination it was found that the injector was broken; that it was absolutely necessary to the operation of the engine to keep this injector working properly; that the only method the engineer had of determining whether the injector was working was by putting his head out of the cab; that if the posts had been placed a foot, or even 6 inches, further back, this duty could have been performed by the engineer with comparative safety.

[3] We think it is the general rule that, where it is possible to do so, a railroad company is required to place structures, used in connection with its road, at such distance from the track that they will not endanger its employés in operating trains, and, where structures are placed by the company in such proximity to the track that they endanger its servants while discharging their duty, the company is liable for an injury that occurs without fault on the part of the employé injured. Railroad Company v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96; West v. C. B. & Q. Ry., 179 Fed. 801, 103 C. C. A. 293; Railway Company v. Michaels, 57 Kan. 474, 46 Pac. 938; Railroad v. Thompson, 210 Ill. 226, 71 N. E. 328.

[4] But it is said that Conley was familiar with the tunnel, having passed through it many times, therefore he assumed the risk. Without deciding whether section 4 of the employer's liability act abolishes the assumption of risk in cases like the present, and viewing the case from a point most favorable to the defendant, we do not think the evidence sufficient to warrant the court in saying as a matter of law that he realized and appreciated the danger, or that the danger was so patent and obvious that he would be conclusively presumed to have known it. The testimony of a number of expert witnesses on the part of both the plaintiff and defendant tended to show that, because of the swaying motion of the engine running over a rough track, it was impossible to ascertain the distance structures were from the track with any degree of accuracy, even in the daytime, and the conditions here were much less favorable. The engine was being operated through a dark and lengthy tunnel at a speed of from 18 to 20 miles an hour, and the posts covered not more than 30 feet of space, and would be passed at that rate of speed in a little more than a second of time. In addition to this, as shown by the condition of the engine after coming out of the tunnel, an emergency had arisen which required the engineer's immediate attention. As stated by one of the witnesses, who was a locomotive engineer: "It might be death to look out of the cab, and death not to look out when the injector is not

working properly." We think the question was properly left to the jury.

Other assignments of error relate to the refusal of certain requested instructions and to portions of the charge of the court to the jury. We do not deem it necessary to discuss these several assignments of error separately. They have all been considered, and we think the charge of the court fairly stated the law applicable to the case.

Upon the whole case, we find no error warranting a reversal of the judgment, and it must therefore be affirmed.