## PERKINS v. NORTHERN PAC. RY. CO.

### (Circuit Court, E. D. Washington, E. D.   November 1, 1911.)

### No. 1,460.

1. MASTER AND SERVANT (§ 265*)—ACTION FOR DEATH OF SERVANT—MATTERS TO BE PROVED.

To subject a master to liability in an action for the death of an employé, it is incumbent on the plaintiff to show not only negligence on the part of defendant, but causal connection between that negligence and the injury of the deceased.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–881; Dec. Dig. § 265.*]

2. MASTER AND SERVANT (§ 276*)—ACTION FOR DEATH OF SERVANT—SUFFICIENCY OF EVIDENCE.

Evidence considered, in an action against a railroad company to recover for the death of an engineer whose body was found with the neck broken lying on the floor of a bridge over which his engine had just passed, and *held* insufficient to warrant a recovery on the theory of the complaint that his death was caused by striking his head against the uprights of the bridge alleged to have been negligently placed too close to the tracks, where he was last seen alive by his fireman and was then setting the hand brake on the tender in a place of apparent safety, and there was no evidence whatever to show how he fell from the engine or what caused his fall.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–954; Dec. Dig. § 276.*]

At Law.   Action by Nellie Perkins against the Northern Pacific Railway Company.   On motion by defendant for judgment notwithstanding the verdict.   Motion sustained.

W. H. Plummer, for plaintiff.
Edward J. Cannon, for defendant.

RUDKIN, District Judge.   On the 28th and 29th days of March, 1908, H. C. Perkins, a locomotive engineer in the employ of the defendant company, together with a train crew consisting of a conductor, a fireman, and two brakemen, was engaged in hauling cars up the Kendrick hill from Kendrick to Howell in the state of Idaho.   The crew made several trips daily, and on the evening of March 29th Perkins met his death while backing his engine down the hill for another load.   The present action was instituted by his surviving widow to recover damages for his death; the complaint alleging negligence on the part of the defendant in failing to equip the tender with air brakes, as required by the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), and in constructing and maintaining the uprights of one of its bridges so close to the track as to endanger the lives and limbs of its employés.   The negligence charged, and the manner in which the deceased met his death, are thus set forth in the complaint:

"That upon said 29th day of March, 1908, through the negligence of the defendant company, the 'tender' attached to said engine No. 58 was not equipped with air brakes or with a 'retainer' to hold said engine and tender

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

while running down said mountain on their return trips. That said engine No. 58 is what is known as a 'hog' engine, and is considerably wider than the ordinary engine, and the tank attached thereto was a foot or two wider than the tank on the ordinary engine. That in running down said mountain it was necessary to have a brake in operation upon the wheels of the tender of the engine in order to relieve the brakes on the drive wheels thereof, so that the latter would not become heated, and thus incapacitated. That on or about the fourth trip of said engine on said day, coming down said mountain, said defendant company furnished said crew, at the town of Troy, a 'brake wheel' to place upon and operate the 'hand brake' of said engine. That said 'hand brake wheel' was put upon said tender at or about the hour of 5 or 5:15 p. m. on March 29, 1908, at the town of Troy, and said engine and tender then proceeded, running backwards, upon said mountain; said deceased handling the same as engineer. That shortly after leaving Troy, and in the discharge of his duty, the said deceased engineer got upon the tender of his engine and tested the said hand brake by tightening the same by means of said wheel, in order to relieve the drive brakes on the engine, as aforesaid. Said deceased after tightening said hand brake stepped down into the 'gangway' between said tender and engine and looked out and down at the wheels of the tender to see, as his duty required him, whether said hand brake was holding on the wheels of said 'tender' and whether it was holding tight enough, if at all. That while in said position his head struck the narrow 'upright' or timbers of said bridge No. 182, thereby knocking deceased from said engine to the track, killing him instantly. That said engine No. 58 was, immediately previous to the death of said Perkins, and for a long time previous thereto, engaged, among other things, in hauling cars over the railroad of said defendant, which cars were used in the movement and hauling of freight between the state of Washington and other states of the United States, and were engaged in interstate commerce by railroad, and said defendant was, at the time of the death of said Perkins, and for a long time prior thereto, a common carrier engaged in interstate commerce by railroad, and that said locomotive No. 58 was constantly and frequently used by said defendant in the movement of interstate commerce. That upon said mountain along said railroad line were a number of bridges besides the aforesaid bridge No. 182, which gave ample clearance between a passing engine or tender and the uprights of said bridges, but that said bridge No. 182, through the carelessness and negligence of the defendant, was built and maintained so that there was not sufficient clearance between the engine or tender such as 'No. 58' and the uprights of said bridge; the width between the uprights of said bridge No. 182 being at least two feet less than the required width or the necessary width or the width between the uprights of said other bridges upon said hill. That the death of the deceased was caused solely by the negligence of the defendant as herein set forth in failing to provide necessary and proper machinery, appliances, etc., particularly in failing to provide brakes upon said tender and in maintaining said narrow bridge."

For the purposes of this opinion, I will admit the sufficiency of the evidence to show that the air brakes on the tender were out of repair; that the bridge in question was too narrow; that the defendant was wanting in due care in both of these respects; and that the plaintiff is entitled to recover if either of these negligent acts was the direct or proximate cause of her husband's death. Nor do I deem it necessary at this time to discuss the question of proximate cause. It is tangible proof of the primary cause that is lacking here; for while the complaint is explicit as to the manner in which the deceased met his death, and as to the immediate cause of his death, there is no direct testimony tending to sustain these allegations. The brake wheel in question was located above the end of the tank about the height of a man's head above the floor of the gangway. The de-

ceased was last seen alive by the fireman at the brake wheel tightening the hand brake. At that time the engine was 100 or 150 yards distant from the bridge, running at the rate of 10 miles per hour. After passing the bridge, the engine gained in speed, and, in looking to ascertain the cause, the fireman discovered that the engineer was gone. The train was backed up to the bridge, and his dead body was found near the center of the bridge, outside of the rails, lying face downward, with the head turned under the left arm, and the neck broken. When found, there was a slight contusion on the right check, the tongue was out, and blood was oozing from the mouth. A day or two later a witness for the plaintiff claims to have found 15 or 20 hairs on the upright of the bridge, about six feet above the rails, which resembled a lock of hair of the deceased submitted to him at the trial. This is all the direct testimony in the case. The plaintiff then offered the following testimony for the purpose of explaining the manner in which the deceased came in contact with the bridge timbers:

"Q. What was the next duty of the engineer after he had tightened the hand brake? A. Why it was to find out whether it had too much braking power, or not enough.

"Q. And how was it necessary for the engineer to obtain this information? A. By looking at the tank brakes to see if the shoes were against the wheels.

"Q. In what position would he of necessity have to place himself, in order to do that? A. He would have to lean out the gangway.

"Q. Go on; how is that? A. He would have to lean out the gangway, to look down to see if they were holding.

"Q. Well, stand on the platform there and assume that you are backing down this way, or that way, that you are standing there in the gangway; just describe to the court and jury how he would have to place himself in order to look down at the air-brake shoes, or the handbrake shoes to ascertain whether or not they were holding, or were too tight or too loose? A. Well, we were backing down west, the tank was going west first, and the cab was following, and he stood tightening the hand brake on the tank, and then, in order to see if they were holding, he would have to lean out of the gangway.

"Q. Well, just lean out and show the court and jury how? A. Well, he leaned out the gangway like this; in this way (illustrating).

"Q. Could he see those brake shoes to ascertain whether or not they were holding too tight or were too loose in any other way? A. Well, he could; but he would have to be entirely out of the gangway.

"Q. In other words, he would be clear out? A. He would be hanging clear out."

Another witness testified:

"Q. Now, in tightening the hand brakes in going down that mountain near bridge 182, just describe how that is done; what the engineer does, and what is his duty to do? A. Why, he will tighten and set up the brakes, and then he has got to look out to see whether it is too tight or too loose.

"Q. Just describe how he looks out, what position he puts his feet in, and how far he has to lean out to find that out? A. He leans out of the gangway and that is about the only way he can see his tank brakes on those wide tenders."

This witness further testified that the gangway was above five feet above the rails, and that the engineer would have to extend his person from 16 to 20 inches beyond the body of the engine or cab in order to see the brakes.

The foregoing is all the testimony bearing directly or even remotely on the manner in which the deceased met his death or upon the cause of death.

A motion for a nonsuit interposed at the close of the plaintiff's testimony was denied. At the close of all the testimony the defendant again challenged the legal sufficiency of the evidence to sustain or justify a verdict in favor of the plaintiff, and moved the court to direct a judgment in its favor under the local practice which prevails in this state. This motion was also denied; the court reserving the right to reconsider the question thus presented on motion for judgment after verdict, should the jury return a verdict in favor of the plaintiff. Such a verdict has been returned, and the defendant has now moved for a new trial and for judgment notwithstanding the verdict.

The latter motion alone will be considered, and in its consideration the court will endeavor not to invade the province of the jury or pass upon questions of fact where the evidence is conflicting. Before accepting the plaintiff's theory of the case, however, I must say that in my opinion her testimony shows that that theory is not only an improbable but an impossible one. According to the testimony offered on her behalf, the bridge in question is 14 feet 5 inches in the clear; the cab of the engine in passing over the bridge would come within less than a foot of the uprights; the tank is still wider than the engine; and the gangway is at least four or five feet above the rails. Making due allowance for the ordinary vibration or swaying of the engine while in motion, this would leave the cab and the tank at least twelve feet in width. The cab and the tank would therefore project almost four feet beyond the rails and the wheels, at a height of approximately three feet above the rails.. This testimony demonstrates how utterly impossible it would be for a man to stand in the gangway of the engine and observe either the wheels or the brakes from the gangway. He could not even see the ends of the ties, much less the wheels or brake shoes. This is shown clearly and conclusively by the blueprint offered in evidence by the defendant, the correctness of which is not challenged by the plaintiff. The view of the engine as there given is even more favorable to the plaintiff than her own testimony, for it shows the engine almost two feet narrower. A person standing in the gangway could not see either the wheels or the brakes without extending his person several feet beyond the cab. Indeed, such an undertaking would be utterly impossible. To observe the wheels or the brakes at all, the engineer would be compelled to descend to the bottom step shown on the exhibit, and even there he would have to peer under the tank. It is not claimed that he did this, nor is it conceivable that any prudent man would do so.

Furthermore, it is strange indeed that a prudent and experienced railroad man would have to resort to such methods for the purpose of ascertaining whether his brakes were too tight or too loose. It would seem to the ordinary observer that he could and would determine that fact by the effect of the brakes on the momentum of his train. Again, if the upright of the bridge struck this man's head

while his train was running at the rate of 10 miles per hour, we would expect to find some more convincing proof of the contact on his person. The contusion found on his head was far more likely to result from his face coming in contact with the floor of the bridge than from coming in contact with the upright of the bridge, as claimed. Moreover, it is extremely improbable that his body would be found in the position in which it was found had he been struck as claimed. Of course, it is impossible to say what effect such a blow would have had on his person, or in what position the body would be found after receiving the blow; but these matters are only referred to for the purpose of showing the inherent improbability that the theory of the case conceived by the plaintiff is the correct one. Giving to the plaintiff, however, the full benefit of all the testimony, there is no proof whatever that the deceased did in fact stand in the gangway or look out for the purpose of observing the condition of his brakes, or for any purpose whatsoever. The whole case rests upon conjecture, guesswork, and speculation, and the cause of death is a mystery which the verdict of a jury does not solve.

[1] In cases of this character it is incumbent on the plaintiff to show, not only negligence on the part of the master, but causal connection between that negligence and the injury complained of. In the oft-quoted language of Mr. Justice Brewer in Patton v. Texas & Pacific Rd. Co., 179 U. S. 658, 663, 21 Sup. Ct. 275, 277 (45 L. Ed. 361):

"Where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employé is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

This rule has been reiterated and reaffirmed in a wilderness of cases, among which I will cite the following: Powers v. Pere Marquette Ry. Co., 143 Mich. 379, 106 N. W. 1117; Cincinnati, N. O. & T. P. Ry. v. Johnica's Adm'r (Ky.) 113 S. W. 844; Wintuska's Adm'r v. Louisville & N. R. Co. (Ky.) 20 S. W. 819; Hughes v. Cincinnati, N. O. & T. P. R. Co., 91 Ky. 526, 16 S. W. 275; Black's Adm'r v. Southern Ry. Co. (Ky.) 108 S. W. 856; Tibbitts v. Mason City & Ft. D. R. Co., 138 Iowa, 178, 115 N. W. 1021; Asbach v. Chicago, B. & Q. Ry. Co., 74 Iowa, 248, 37 N. W. 182; Neal v. Chicago, R. I. & P. Ry. Co., 129 Iowa, 5, 105 N. W. 197, 2 L. R. A. (N. S.) 905; O'Connor v. Chicago, R. I. & P. Ry. Co., 129 Iowa, 636, 106 N. W. 161; Donald v. Chicago, B. & Q. Ry. Co., 93 Iowa, 284, 61 N. W. 971, 33 L. R. A. 492; Hyer v. Janesville, 101 Wis. 371, 77 N. W. 729; Armstrong v. Town of Cosmopolis, 32 Wash. 110, 72 Pac. 1038; Reidhead v. Skagit County, 33 Wash. 174, 73 Pac. 1118; Stratton v. Nichols Lumber Co., 39 Wash. 323, 81 Pac. 831, 109 Am. St. Rep. 881; Stone v. Crewdson, 44 Wash. 691, 87 Pac. 945; Peterson v. Union Iron Works, 48 Wash. 506, 93 Pac. 1077;

Olmstead v. Hastings Shingle Mfg. Co., 48 Wash. 657, 94 Pac. 474; Whitehouse v. Brandt Lumber, etc., Co., 50 Wash. 563, 97 Pac. 751; Weckter v. Great Northern R. Co., 54 Wash. 203, 102 Pac. 1053; Searles v. Manhattan R. Co., 101 N. Y. 661, 5 N. E. 66; Borden v. Delaware, etc., R. Co., 131 N. Y. 671, 30 N. E. 586; Grant v. Pennsylvania, etc., R. Co., 133 N. Y. 657, 31 N. E. 220; Tyndale v. Old Colony R. Co., 156 Mass. 503, 31 N. E. 655; Cumberland, etc., R. Co. v. State, 73 Md. 74, 20 Atl. 785, 25 Am. St. Rep. 571; Sorenson v. Menasha Paper, etc., Co., 56 Wis. 338, 14 N. W. 446; Manning v. Chicago, etc., R. Co., 105 Mich. 260, 63 N. W. 312; Southern Pacific Ry. Co. v. Johnson, 69 Fed. 559, 16 C. C. A. 317.

In the case last cited, Judge Morrow of this circuit said:

"There is an entire absence of evidence as to how Johnson fell from the engine, and the cause of his fall is involved in uncertainty and doubt. That he was thrown from the running board by reason of the jarring of the locomotive is not the only reasonable inference that the evidence is susceptible of, as counsel for defendant in error contends. If it were the only reasonable inference that could be drawn, it might then well be said that the question should have been submitted to the jury to abide their judgment and verdict. But whether the deceased fell from the engine by reason of his own negligence, or was thrown off, is uncertain. Even an appeal to conjecture, if such could supply the place of legitimate evidence, does not aid us, for several hypotheses present themselves. Johnson, in turning around to return to the cab, may have released his hand from the handrail, or he may have slipped, or possibly, as suggested by counsel for the company, he may have become dizzy."

The court then quoted with approval the language of the Supreme Court of Michigan in Redmond v. Lumber Co., 96 Mich. 545, 55 N. W. 1004, as follows:

"The deceased was killed, and no one knows how. That is not enough to subject the railroad company to liability. Negligence must be shown."

There is nothing in the opinions in Choctaw, Oklahoma, etc., R. R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96, or St. Louis, I. M. & S. Ry. Co. v. Conley (C. C. A.) 187 Fed. 949, cited by the plaintiff, inconsistent with these views. In each of the cases last cited the jury might well have found from the testimony that the deceased was killed at the point where he was last seen alive in the discharge of his duties. In this case, on the other hand, the jury would have to presume or infer, without evidence, that the deceased left the place where he was last seen—a place of apparent safety—and went to another place and there met his death.

[2] I will say, in conclusion, that it would be useless for me to attempt to evolve some other theory or assign some other cause for the death in question that would be equally consistent with the testimony before me. As said by the court in Reidhead v. Skagit County, supra:

"We might go on theorizing as to the cause of death, and arrive at the point from which we started. This unfortunate affair is involved in mystery. We cannot ascertain the cause of death, or see how any jury could consistently ascertain it from the testimony produced in the superior court. A jury's verdict must be founded on evidence. It is within their province to decide as to the weight or preponderance of testimony, under proper instructions of the court. But when there is a total failure of proof as to a ma-

terial and controverted allegation, a jury has no right to speculate thereon.
* * *

"Misfortunes often happen through causes that cannot be ascertained. Human laws and institutions cannot correct every wrong, or afford compensation for every loss or affliction. To uphold the verdict of a jury in a civil cause, where there is no evidence to justify it, is not administration of justice, but the deliberate taking of the money or property of one party and transferring it to another."

And unless an accident and a theory unsupported by testimony will support a verdict, a judgment for the plaintiff in this case cannot stand.

The judgment heretofore entered in favor of the plaintiff is therefore set aside, and a judgment will be entered for the defendant non obstante veredicto.