[No. 10915.  Department Two.  August 6, 1913.]

ANNA DAVIES, *Appellant*, v. ROSE-MARSHALL COAL COMPANY, *Respondent.*

CONRAD ARTHUR DAVIES, *by his Guardian Ad Litem etc.*, *Appellant*, v. ROSE-MARSHALL COAL COMPANY, *Respondent.*[1]

APPEAL—RECORD—STATEMENT OF FACTS.  An objection that the statement of facts, as certified, contained improper additions to the stenographic report of the evidence cannot be heard on appeal on mere exceptions to the order of the court allowing the same, the remedy being by mandamus to compel the judge to certify a proper statement.

TRIAL—PROVINCE OF COURT AND JURY—DIRECTING VERDICT.  The court can withdraw the case from the jury and direct the judgment only where there is want of substantial evidence on some matter in issue material to be established, and not merely where a new trial could be ordered because against the weight of the evidence.

MASTER AND SERVANT—INJURY TO SERVANT—SAFE PLACE—WORKING PLACE IN COAL MINE—NEGLIGENCE—DEATH—CAUSE—EVIDENCE—SUFFICIENCY.  There is sufficient evidence that the negligence of a coal mine owner caused the death of a miner, where it appears that his working place was not sufficiently supplied with air to dissipate carbon monoxide gas arising from the use of dynamite, that the presence of such gas was detected and a search made and the body of the deceased was found where it had fallen, upon his apparent hasty effort to escape from his working place, and characteristic symptoms on the body indicated to experts that he had met his death through poisoning from carbon monoxide gas.

Appeal from a judgment of the superior court for King county, Holcomb, J., entered June 27, 1912, in favor of the defendant, notwithstanding a verdict in favor of the plaintiffs, in an action for wrongful death.  Reversed.

*Brady & Rummens*, for appellants.

*John W. Roberts* (*George D. Emory*, of counsel), for respondent.

[1]Reported in 134 Pac. 180.

FULLERTON, J.—On December 30, 1910, one Thomas Davies met his death in a coal mine operated by the respondent, the Rose-Marshall Coal Company. Davies was at that time an employee of the respondent, engaged in the work of running a shaft along the vein of coal. The appellant Anna Davies is the widow of Thomas Davies, and the appellant Conrad Arthur Davies is his son. The appellants conceived that the death of Thomas Davies was the result of negligence on the part of the respondent, and brought separate actions against it to recover damages for his death. For the purposes of trial, these actions were consolidated by the court, and tried as one action. On the trial, at the conclusion of the evidence, the respondent interposed a challenge to its sufficiency. This challenge the trial judge held to be well taken; but at the solicitation of the appellants, and that a new trial might be avoided if the appellate court disagreed with his conclusion, consented to submit the question of fact to the jury; announcing at the same time that, if the jury returned a verdict for the appellants or either of them, he would, on motion of the respondent, set the verdict aside and enter a judgment in favor of the respondent. The cause was thereupon submitted to the jury, which returned a single verdict finding in favor of the appellant Anna Davies for the sum of ten thousand dollars, and in favor of the appellant Conrad Arthur Davies in the sum of five thousand dollars. On the return of the verdict, the respondent moved to set the same aside, and for judgment in its favor notwithstanding the verdict. This motion the court granted, the court dismissing the action with prejudice. This appeal followed.

Before passing to the principal question suggested by the record, it is well to notice an objection made by the respondent to the statement of facts as certified into this court. In presenting their proposed statement of facts, the appellants did not adopt, as correct in its entirety, the transcript of the evidence made by the stenographer who took down the proceedings, but supplemented the testimony of certain wit-

nesses by making additions thereto. The respondent objected to these additions, when the statement of facts came on to be settled, contending and attempting to show by affidavits that the witnesses whose testimony was added to did not testify according to the proposed corrections. The court, however, allowed the corrections to stand, over the objections of the respondent, and certified them as a part of the proceedings. The respondent asks us to disregard these additions, and consider the record as though they formed no part thereof. But manifestly we are bound by the record as certified. If a trial judge does not settle and certify a proper statement, the remedy is by mandamus to compel him so to do; the party objecting cannot, by merely excepting to the ruling of the court allowing matters to stand in the record to which he objects, have the question reviewed in this court on the hearing of the appeal. *Warburton v. Ralph*, 9 Wash. 537, 38 Pac. 140; *Scott v. Bourn*, 13 Wash. 471, 43 Pac. 372; *State ex rel. Roberts v. Clifford*, 55 Wash. 440, 104 Pac. 631.

As indicated in the outline we have given of the case, the sole question presented by the appeal is the sufficiency of the evidence to justify the verdict. But before stating the evidence, it is well to recall that the action is one at law in which the appellants are entitled to the judgment of the jury on the weight and sufficiency of the evidence, and that the court is warranted in interfering with the verdict only in the case there is a want of substantial evidence on some matter in issue material to be established in order to justify a recovery. It is not enough that the evidence of the opposing side may seem to preponderate, or that the court may think it entitled to the greater credibility; these considerations may justify the trial court in granting a new trial before another jury, but they do not justify taking the case entirely from the jury and determining the questions in dispute as questions of law.

Turning to the record, it appears therefrom that the mine

in which Davies was working at the time he met his death was in the process of development, and had not yet reached the stage of a commercial mine. A shaft had been sunk on the coal vein, which has a slant of some sixty-five degrees, to a depth of perhaps 275 feet, and from the bottom of the shaft a tunnel called a gangway was driven along the vein of the coal for about 500 feet. Some thirty feet above the gangway, and parallel therewith, another tunnel was driven, called a counter. The counter constituted the chief air passage in the mine. Air forced into the mine from the fans above was turned into the counter and from thence distributed to the various working places in the mine, having its final exit along the gangway and up the main shaft. From the gangway, at distances apart of about sixty feet, chutes were driven upwards on the coal vein, and cross tunnels driven between them at varying distances, the object being to block out the coal that it might be more safely and expeditiously mined. These perpendicular chutes were numbered, commencing at the chute nearest the main shaft, from one to ten consecutively. Chutes six, seven and eight were driven perpendicularly on the coal vein for some sixty feet and for that distance had a slope of sixty-five degrees; from this point they were driven at an angle on the coal vein so as to form a slope of thirty-nine degrees. These chutes necessarily passed through the counter or principal air tunnel, and partitions containing doors were installed in the counter to arrest the air current and direct it to the working places.

Chutes nine and ten had been driven but a short distance above the counter when the accident to Davies happened. The operators of the mine were at this time working two shifts, the one began between 7 or 8 o'clock in the morning, and quit at 3:30 o'clock in the afternoon; the men usually stopping at 11:30 o'clock for some half or three-quarters of an hour for lunch. The second shift commenced when the first shift left off work. Davies, at the time he was killed, was working on the morning shift, and in chute eight. He went to

work at the usual hour, and continued until about 11:30, when he lighted the blasts that he had previously loaded, and went down into the gangway for lunch. Other miners also came down at about the same time, and they ate their lunch together at a place in the gangway some distance towards the main shaft from Davies' working place. At this time, the force in the mine proper was not large. One man worked in chute seven immediately to the left of Davies, another in chute nine, immediately to his right; two others worked in a new working shaft which was being run from the gangway to the surface; two were engaged in hauling coal from the chutes to the hoist, and another in operating the hoist. Between 12 and 12:30 o'clock, all of the men went back to work, with the exception of Davies. He stayed and talked with the hoist tender concerning a hunting trip they were planning to take, and did not start back until about 2 o'clock. On his starting for his work, the hoist tender remarked to him the short time he had left in which to work, and was answered to the effect that he wished to trim up the chute before quitting time. This was the last time Davies was seen alive. The second shift came into the mine shortly after 3:30 o'clock. One Evans, who worked the second shift in chute eight, went up to the entrance of the chute, but did not go as far as the face on account of the condition of the air, finding evidence of the presence of carbon monoxide gas in such quantities as to lead him to believe it unsafe to remain. On his way back, he heard inquiries being made for Davies; and on being told that he was missing, turned and went back into the chute for the purpose of ascertaining if he was there. On entering the chute, he again detected the presence of carbon monoxide gas, but went back sufficiently far to see into the face of the chute, and into a crosscut that was started for the purpose of connecting with chute seven. The other men were then called, and after a man had been sent to the surface to make certain that Davies had not left the mine, a search was started for him, and his body found

at the bottom of chute eight next the gangway, he having apparently fallen head first down the chute.

There were scratches and contusions upon Davies' body, and his skull was fractured near its base. The miners, suspecting that he might have been overcome by gas, sought to resuscitate him, but without success. The body was taken to the surface and washed. The head, neck and shoulders were described by witnesses for the appellants as having a mottled appearance, the face and neck being cherry red. The blood, also, that escaped from the wound at the base of the skull was of the same bright red color, and did not coagulate for some considerable time after exposure to the air. The medical expert of the appellants testified that the cause of the death of Davies was poisoning from carbon monoxide gas. A miner whom the court allowed to qualify as an expert testified to the same effect. The respondent's experts, on cross-examination, in answer to hypothetical questions embodying the facts testified to by the appellants' witnesses as to the appearance of the body of the deceased, said that it presented the characteristic appearance of poisoning by carbon monoxide gas. Davies' pick was found lying on a small body of loose coal at the face of chute eight. Some portion of his wearing apparel (not named in the evidence, but said in the appellants' brief to have been his cap and lamp) were found about half way down the chute from his working place to the change in the angle of the chute.

Sometime prior to Davies' death, the respondent started to drive a new working shaft from the gangway to the surface; starting it at a point between the existing air shaft and Davies' working place. The workmen commenced in the gangway and drove two chutes, each about five and one-half feet square, to the surface. These chutes necessarily passed through the counter, and when opened at the top offered an escape for all the air forced into the mine, preventing it from circulating at the places where the mining was being carried on. To overcome this difficulty a device called an

overcast was constructed at the junction of the chutes with the counter. This consisted of digging the counter wider at the point of junction, and dividing it by a partition so constructed as to leave an air passage along the counter and at the same time an opening through the chutes. The shaft was completed by digging out the coal between the chutes. To dig out this coal, work was begun at the top, the coal excavated being allowed to drop down the shafts into bins at the gangway, from whence it was carried to the hoist and brought to the surface. The work of excavation was carried on continuously, while the work of removing the coal excavated was carried on only a part of the time. At some time during the course of the work, and prior to Davies' death, the bottom of the overcast at the counter was broken by falling coal excavated from the pillar between the chutes. This allowed air to escape from the counter into the chutes whenever the coal accumulated in the chutes was lowered to a point below the bottom of the overcast. The chutes were emptied to a point below the counter on the day Davies met his death. A witness testified, also, that the trapdoor between chutes eight and nine was found open on the day of the accident, allowing such air as was then circulating in the mine to pass directly through the counter, instead of being forced into the Davies working place. Carbon monoxide gas is not a gas incident to this particular mine. It arises from the process of blasting with dynamite. The gas is lighter than air and hence collects in the upper part of the chutes, and is dissipated by forcing currents of air through it.

There was evidence in the record contradictory of much that we have recited, especially as to the appearance of Davies after death and the amount of air in his working place. Other circumstances, also, were shown which would indicate that Davies might have met his death from another cause than from poisoning by carbon monoxide gas. We think, nevertheless, that the court wrongfully withdrew the questions of fact from the jury. It is clear to our minds that there was

here abundant evidence to warrant the jury in finding that
Davies came to his death by poisoning from carbon monox-
ide gas, and that it was the negligence of the respondent
that he came into contact with it. It is the mine owner's
statutory duty to provide in every coal mine a good and
sufficient amount of ventilation for the employees therein, to
be in no case less than one hundred cubic feet of air per
minute for each person in the mine, and the air must be made
to circulate through the shafts, levels, and working places
of the mine, and on the traveling roads to and from such
working places. To furnish the required amount of air and
to make it circulate throughout the mine where men are work-
ing, is the nondelegable duty of the mine owner. The evi-
dence to our minds justifies a finding to the effect that this
duty was neglected in this instance. The evidence as to the
immediate cause of death is more circumstantial, but we
think equally sufficient. Summarized, it shows a cause for
the collection of the poisonous gas, insufficient air to dissem-
inate it, the entrance of Davies into the gas, his apparent
hasty effort to escape from the place, and the presence on
his dead body when found of the characteristic symptoms of
poisoning by this particular gas. To allow the jury to de-
termine from evidence of this character as to the cause of
death is not to allow them to speculate, but is to allow them
to determine ultimate. from probative facts.

The respondent cites and relies on the following cases
from this court: *Hansen v. Seattle Lum. Co.*, 31 Wash. 604,
72 Pac. 457; *Armstrong v. Cosmopolis*, 32 Wash. 110, 72
Pac. 1038; *Reidhead v. Skagit County*, 33 Wash. 174, 73
Pac. 1118; *Stratton v. Nichols Lum. Co.*, 39 Wash. 323, 81
Pac. 831, 109 Am. St. 881; *Stone v. Crewdson*, 44 Wash. 691,
87 Pac. 945; *Peterson v. Union Iron Works*, 48 Wash. 505,
93 Pac. 1077; *Olmstead v. Hastings Shingle Mfg. Co.*, 48
Wash. 657, 94 Pac. 474; *Whitehouse v. Bryant Lumber &
Shingle Mill Co.*, 50 Wash. 563, 97 Pac. 751.

An examination of these cases will show, however, that in

each of them the cause of the injury or death which was the subject of the inquiry was left wholly unexplained or undetermined. It is not so in the present case. Here there is substantial evidence touching each inquiry necessary to be established in order to warrant a recovery. The question what caused the death was, therefore, for the jury and not the trial court.

The judgment appealed from is reversed, and the cause remanded with instructions to overrule the motion for judgment notwithstanding the verdict, and to proceed according to the usual course of practice to a final determination of the case.

CROW, C. J., MAIN, and ELLIS, JJ., concur.