## TREMELLING v. SOUTHERN PAC. CO.

No. 4510. Decided June 10, 1927. (257 P. 1066.)

*Beck & Beck,* and *Walton & Walton,* all of Salt Lake City, for appellant.

*Bagley, Judd & Ray,* of Salt Lake City, for respondent.

THURMAN, C. J.

This action was instituted by plaintiff to recover damages for the death of her husband, Claude J. Tremelling, who at the time of his death was in the employment of defendant as a brakeman on one of its railroad trains. The defendant was operating an interstate railroad between Ogden, Utah, and Montello, Nev., and the action was brought under the pro-

visions of the federal Employers' Liability Act of April 22, 1908 (U. S. Comp. St. §§ 8657-8665). The death of deceased occurred on December 9, 1915, and the action was commenced in the district court of Salt Lake county, Utah, in June, 1916. The plaintiff had judgment, and defendant appealed therefrom to this court. The judgment was reversed on the grounds that the evidence was insufficient to sustain the verdict. 51 Utah 189, 170 P. 80. A new trial was had in April, 1926, resulting in a nonsuit of the plaintiff and judgment thereon, from which judgment plaintiff prosecutes this appeal.

The pleadings in the case are the same as when the case was commenced, and the substance thereof is briefly stated in the opinion of this court on the former appeal at page 193 (170 P. 80) of the report, as follows:

"The allegations of negligence, in substance are that the defendant constructed and maintained a side track at a station near Tecoma on its line of railroad in the state of Nevada; that defendant's negligence consisting in constructing and maintaining said side track so near to the main line of its railroad, and in placing a large freight car thereon, that the deceased, who was employed as a brakeman on one of defendant's freight trains, and while in the discharge of his duties on said train, on the 9th day of December, 1915, came in contact with said car on said side track while said train was passing the same, and was instantly killed. The defendant, while admitting the construction and maintenance of said track and placing the freight car thereon alleged, nevertheless denied all acts of negligence, and averred in its answer that the deceased came to his death by reason of his own carelessness and negligence, and also averred that he had assumed the risk of injury, fully stating the facts in that regard."

On the last trial of the case most of the evidence introduced by plaintiff was read to the jury from the transcript on appeal from the former judgment. The new evidence in the case consists mainly of the testimony of two medical experts and one meteorologist from the Weather Bureau, all of whom reside in Salt Lake City.

The undisputed physical facts relating to the death of deceased, as disclosed by the evidence, are, as follows: Defendant's railroad from Montello to Ogden runs substantially east and west. At Tecoma, a town about five miles east of Montello, a side track was constructed close to the main line, on the south side thereof, and on the morning of the accident there was a large box car standing thereon. Several measurements relating to the cars on both the main line and the side track were stipulated by the parties and will hereinafter be stated. The train on which deceased was employed when the accident occurred left Montello going east at 8:53 a. m. on the day of the accident. It was a cold, frosty morning. The crew of the train consisted of a conductor, engineer, fireman and two brakemen. Deceased was head brakeman and was informed by the conductor before leaving Montello that he had put a car on with a new pair of wheels. He directed deceased to keep his eye on the car to see that the wheels "didn't run hot." The wheels in question were the rear wheels on the car next to the engine. The rear brakeman testified that he gave deceased the proceed signal on leaving Montello and deceased conveyed it to the engineer; that the last time he saw deceased was at Tecoma on top of the train. The fireman testified that after leaving Montello he first saw deceased on the engine; that after he saw him on the south side of one of the cars—either the head car or the next one—as they proceeded through Tecoma; that deceased was either on the rear of the head car or on the front of the next car; that he was standing in the stirrup and had hold of the grabiron looking down "apparently looking at a hot-box." Witness only got a glimpse of deceased and supposed he was looking at a hot-box. He could not tell whether deceased was looking forward or backward. He supposed that deceased had both feet in the stirrup, but was not sure; that he merely glanced at him and then turned and looked at houses on the other side of the train. Witness could not say whether deceased was in the usual position. He had never seen it

done that way but once or twice before. The usual way to watch a hot-box was to stand in the gangway of the engine and look back. He did not know whether there was a hot-box on that train or not.

A half or three quarters of an hour after the train passed through Tecoma the body of deceased was found by a Mr. Purdy, maintainer of the defendant company. He reported finding the body to the witness Lee, a storekeeper at Tecoma. Lee testified that he and Purdy went to the body, which was lying flat on its stomach. "His head was right up against the rail of the passing track with the feet towards the main line." One hand was out, and that was all they could see, as the mackinaw worn by deceased was over his head. There was a heavy frost on the ground. The indications were that the body had struck the ground heavily in the middle of the space between the two tracks and just opposite the center of the box car. From that point it slid to the point it was found against the north rail of the side track near the northeast corner of the box car. The testimony of Lee as to the marks on the ground and the position of the main line and side track with the box car thereon is fairly well illustrated by a diagram found in the opinion of the court on the former appeal, at page 195 of the report. The marks showing the body struck the ground and slid to where it was found were clearly indicated by the gravel being thrown up and the frost being brushed away. The buttons on deceased's vest were torn off or broken. It bore marks as if he had slid on his stomach to the point where they found it. Lee and Purdy examined the north side and west end of the box car to discover if the body had hit the car. The frost was about a quarter of an inch thick. They could find no place where the frost had been disturbed. Witness said if there had been no frost on the car he would have seen it the first thing. There was blood where the body struck the ground and all along the mark to where it stopped. There was no mark or blood discovered on the car, nor was there any mark or blood discovered on the ground

west of where the body struck the ground. They spent about ten minutes in examining the car. There was a tear in the back of deceased's mackinaw. They found a mitten glove and turned it over to the claim agent. Witness testified that the back of deceased's skull was crushed to a pulp—a little more to the right side than the left. There were slight scratches on the face and one eye was discolored. There were also some cinders in the face. There were no cuts through the skin at all on the head. Deceased had bled through the ears, nose and mouth, and the blood on the ground apparently came from those places. There were no projections on the train that extended out as far as the point where deceased fell.

At the last trial of the case the skull was introduced as an exhibit and is made part of the record on appeal. The back part of the skull from the base of the brain to about half way to the crown appears to have been badly shattered. Five pieces became detached from the skull. The first is 4½ inches long by 3 in width at the widest part; the second about 2½ inches in length and the same in width; the third about 2 by 2 inches, and the fourth about the same. All of the pieces are irregular in form, and the above measurements are from one extreme to the other, as to each piece measured. There are three small pieces not detached from the skull indicating fractures from the back of the skull towards the right ear.

This minute description is of only slight materiality, but it more nearly states the facts than to describe the back of the skull as having been crushed to a pulp.

Lee and Purdy did not disturb the body, but waited until the arrival of the coroner, who appeared about an hour after they had made their examination. The coroner and his jury prosecuted a further examination after their arrival. There was still frost on the car and the ground, but, as stated by witness Lee, not quite as heavy as when he and Purdy arrived at the body, which was after 10 o'clock, and he did not think it was freezing at that time.

Mrs. Tremelling, the plaintiff, testified that the tear in the mackinaw worn by deceased was not there when he left home a few days before the accident, and that when she last saw him the buttons were on his vest.

The train upon which deceased was employed that morning was composed of 46 cars carrying fruit, and the caboose. They were Pacific fruit express cars known in railroad parlance as "P. F. E." cars. Each car was 42 feet in length. On the right side of the second car, at the front end, was an iron ladder consisting of six rounds and a step or stirrup. The stirrup extended below the body of the car. On the rear end of the first car from the engine, on the south side, was a grabiron, about 3 feet from the bottom of the car, and a stirrup extending below the body of the car, the same as on the other car. It was on one or the other of these cars, with his feet on the step or stirrup and his hand holding on to the ladder or grabiron, that the fireman last saw the deceased. The train was running 25 or 30 miles an hour, or a little over, when the accident occurred. Before the train reached Tecoma there was considerable fog, but it appears there was no fog while passing through the town.

The following measurements were stipulated by the parties: The step or stirrup on the P. F. E. car is 2 feet 2.25 inches above the ground. The bottom of the body of the car is 3 feet 7.5 inches above the ground. From the bottom of the body of the car to the stirrup is 1 foot 4.8 inches. The outside measurement of the car from side to side is 9 feet 3 inches. From the center of the south rail of the main line to the outside of the stirrup is 2 feet 6 inches, and from the center of the south rail to the outside of the body of the car is 2 feet 1.25 inches. The stirrup projects out farther than the car 4.2 inches. The handhold on the side of the car projects out from the car 3 inches. The measurements on the box car on the side track were as follows: The outside measurement at the end of the car is 9 feet 10.8 inches. The handhold on the ladder at the end of the car projects out 5 inches. "They project out from the end of the car in

the direction that the car runs, but the handhold of the side latter projects out from the car 3.25 inches." From the center of the north rail to the east side of the car is 2 feet 6 inches. The outside length of the car is 40 feet 8.4 inches. There is also evidence to the effect that the distance between the center of the north rail on the side track and the center of the south rail on the main line is 7 feet 5 inches. From these measurements the clearance between the car on the main line and the box car on the side track may be determined.

Several railroad men were called as witnesses. Their testimony is conflicting as to whether the manner in which deceased was seen standing on the side of the car, when a train is running as on the occasion in question, was the usual manner of performing the duty which had been assigned to deceased. We may therefore dismiss that question without further consideration except to say that such witnesses all agreed that such method of performing the duty, when a train is running at the speed shown by the evidence is exceedingly dangerous.

The foregoing statement contains the substance of all the material evidence produced by plaintiff, except that of her expert witnesses to whom reference has been made. The evidence thus far referred to, except the production of the skull, is substantially the same as that presented on the former appeal. And as far as concerns the production of the skull it may be said at this stage of the opinion, as well as later on, it sheds no additional light on the question involved, except to show that the skull was not as badly comminuted as appears from the testimony of the witness Lee, who testified it was "mashed to a pulp."

Several witnesses on the part of defendant, on the first trial of the case, testified concerning the condition as to frost. They were not called on the last trial, as no evidence was offered by defendant. The evidence of Lee, however, at the last trial, to the effect that the north side and west end of the box car was covered with frost when he

appeared on the scene, and that if there had been any frost brushed off the car he would have seen it, stands unchallenged. It is therefore the opinion of the writer that the evidence thus far considered is substantially the same as the evidence upon which the court reversed the judgment on the former appeal.

We will now consider the testimony of the experts:

Dr. Garland A. Pace, sworn as a witness, testified as a specialist in nervous and mental diseases. He practices in Salt Lake City, and stated the most of his business was referred to him by other physicians. His business required a knowledge of the anatomy of the brain, of the nervous system, and the skull, and he had had considerable experience in that line. He had exhumed the body of the deceased at the request of plaintiff and had examined the condition of the skull. The whole back of the skull was broken from a point half way between the crown and neck down to the neck. It was broken more on the right side than on the left. He also examined the long bones of the arm and found no fracture. He brought the skull with him into court and described the fracture in detail. He stated there were arteries and veins in the skull, and described them. The blood of a normal person is under pressure. The effect of his testimony at this point was that when an artery is ruptured, if the skin is also cut or ruptured, the blood will spurt out instantly. It the skin is not cut or ruptured the blood will pass beneath the scalp and likely find its exit through the mouth, ears and nose. It will require a little more time than if the skin were ruptured also. Inasmuch as the skin or scalp of the deceased's head was not cut or ruptured and the blood was issuing from his mouth and nose the witness was of the opinion that he must have been hit before he lit on the ground; otherwise blood would not have been at the place where he lit. The witness was asked on direct: "Could a skull be fractured as this skull was by a fall from the side of a railroad car 7 feet above the ground, the train traveling between 25 and

30 miles an hour, and the ground covered with soft gravel?" Objections were made to the question on several grounds, principally on the ground that some of the hypotheses assumed were not in evidence. The court, however, overruled the objection, and the witness answered: "I am not able to answer that question; I don't know." Asked if arteries and veins were ruptured within the skull, if the blood would make an exit immediately through the ears, mouth or nose, witness answered, "It might do so;" but he rather thought it would take a little time. He thought a blow that would produce such fractures would render a person unconscious instantly. Witness was then asked: "If a person is rendered unconscious, which way is he inclined to fall?" This was objected to on the ground that there was nothing in the question which indicated which way he was going to fall. The court sustained the objection remarking that: "So much would depend upon the position of the man when he was rendered unconscious." There was no error in the ruling. The following question was asked:

"Assume a person is hanging from the side of a railroad car and the car is proceeding at a speed of 25 or 30 miles an hour, or a little faster, and that the person, being in his normal senses, is rendered immediately unconscious; if he falls on the ground what position is he likely to assume when he hits the ground; in what position will his body be when he falls to the ground?"

An objection to the question was sustained. Even if it be conceded as a scientific fact that a body rendered immediately unconscious has a tendency to fall on its face, which seemed to be the theory of plaintiff's counsel, the ruling of the court was not prejudicial error because Dr. Root, also a witness for plaintiff, was permitted to testify at length that the tendency of a human body suddenly rendered unconscious is to fall on its face, and such evidence is uncontradicted. As far as this record is concerned it is an undisputed fact. The question was then asked: "Assuming all the hypotheses in the next preceding question, if a person falls from a car or slips from it while conscious,

ordinarily what portions of his anatomy are affected—broken?" This was objected to and the objection sustained. The ruling was not error. A question was then asked, assuming the hypotheses in the last two questions, "What are the ordinary reflex actions, or what is the ordinary conduct of a person when he falls or slips?" An objection was sustained, principally on the ground that the body of deceased had slid 20 feet from where it hit the ground. We think the objection was properly sustained. The witness then described a Colle fracture as one which occurs immediately above the wrist and is "usually caused by lighting on the extended arms in an endeavor to catch one's self." There was no Colle fracture disclosed by his examination of deceased's body. Witness said a much greater force would be necessary to produce the fractures in the skull than would be required to produce a Colle fracture. It required a violent blow to produce the fractures in the skull. The blow was caused by a blunt instrument. The question was then asked whether the skull disclosed evidence of a blow that would ordinarily be received by falling on the ground. Objected to and sustained. The question was defective in not containing sufficient data from which an intelligent answer could be given. The person might topple over from no height at all except the length of his body, or he might fall from a height of 5, 10, or 50 feet. Manifestly, there would be some difference in the effect. On cross-examination the witness was asked: "Assuming that a person weighing 155 pounds, moving at a velocity of 30 miles an hour, struck on his head, can you tell us, do you know with what momentum he would come in collision with the ground?" The question was objected to. Objection overruled. On suggestion of counsel that the velocity would be 44 feet per second and the momentum of such a body 6,875 pounds, the witness was then asked if the head or skull hit the ground with such a force as that would it cause the blood to instantly spurt from the nose and ears. The witness answered: "It might do; yes, sir."

Dr. E. F. Root testified on behalf of plaintiff. He quali-
fied as a physician and surgeon of long experience. He had
about the average experience that a general surgeon has
with skull fractures and had examined the skull
of deceased. He said the fractures wher caused by a ■
severe blow on the back of the head and right side.
Objection was sustained to a question asked whether the
fractures could be caused by coming in contact with the
end of a box car. That such might be the effect is a matter
of common knowledge. The objection was properly sus-
tained. The witness further stated:

"The person to whom the skull belonged was rendered unconscious
instantly by the blow. If there were no break in the skin the blood
would escape through the ears, nose, and mouth, and perhaps,
through the eyes."

The witness was asked:

"Assume that a person is found lying on the ground face down-
ward, bleeding profusely from the eyes, mouth and nose, with a
skull fracture such as you find Exhibit K (the skull) to be frac-
tured, and assume that an examination of the ground discloses that
he has lit 20 feet beyond the point where he is found and skated or
slid along the top of the ground to the place where he stopped and
where he was found, and that there is blood between the place where
he is found and the place where he apparently lit, all along there,
all along the path he took in sliding; now Doctor, in your opinion,
was the skull fractured before he hit the ground or after he hit
the ground?"

This was objected to and the objection overruled. The
witness answered:

"I should say that the injury had occurred and the bleeding had
begun prior to the time when the body began to slide and con-
tinued to bleed during the sliding process."

The witness described a Colle fracture substantially the
same as did Dr. Pace. On the assumption that a body
weighing 160 pounds moving through the air at a speed of
30 miles an hour would acquire a momentum of 6,875
pounds, the witness stated that if a body fell from a car

at that rate of speed, thereby sustaining a fracture of the base of the skull, the blood would burst from the nose, ears, or mouth almost instantly. In answer to a question as to what is the essential difference between the relation of the muscles and the bones between a conscious man and an unconscious man the witness answered:

"In a conscious person the muscles are at a degree of tension just sufficient to balance, one set balancing the other, unless under stress, then certain muscles become tense. In an unconscious person there is no tone or tension to the muscles."

The result of a conscious person falling and undertaking to protect himself is that he most always gets broken bones, while the other falls in a heap and usually very little injury is sustained. When a person is rendered unconscious, is either dead or simply in a faint, he always falls on his face unless there is a very great deterring force to reverse that. That is common knowledge. It is knowledge gained in the War and from the accidents of everyday life. If an unconscious person should fall the position in which he would light would depend on the distance he had to fall and the velocity with which he was moving. A conscious person would fall in any conceivable position.

J. Cecil Alter, meteorologist in the Weather Bureau in the Department of Agriculture, qualified as to his experience, and testified that it was his business to observe weather conditions generally and to study and observe water in the form of dew, ice, rain, hail snow and frost. The temperature at Tecoma, Nev., December 9, 1915, as shown by the records, was 48 maximum and 24 minimum, Fahrenheit. The record does not show the period of the day when the minimum was 24. Frost would appear on iron a little bit earlier than it would on wood. Frost occurs when the moisture is condensed out of atmosphere at a temperature below freezing. Freezing is at 32. A high humidity has a direct relation to the quantity of frost, the moister the air, the more generous the deposit. The presence of fog is an indication of high humidity. The testimony of this witness

was purely academic and had no apparent relation to any material issue in the case.

When plaintiff rested a nonsuit was granted, on motion of defendant, on the ground that the evidence was insufficient to sustain a verdict for the plaintiff.

The theory of plaintiff, as stated in the complaint and contended at the trial, is that the deceased, Claude J. Tremelling, while in the performance of his duties as brakeman, was struck by the box car on a side track, which side track had been negligently placed by defendant too close to the main line.

Respondent's contention is that there was no substantial evidence to support a verdict for the plaintiff. Respondent also insists that there were several ways in which the death of deceased might have occurred, each of which was as probable, or more probable than the theory relied on by appellant; and in neither of which would respondent be liable for the deceased's death. The rule relied on by respondent is well stated in the opinion of this court on the former appeal, 51 Utah, at page 200, as follows:

"The rule is well established that where an accident occurs through the alleged negligence of one person which results in injury or damage to another, and the injured person seeks to recover damages, and it is made to appear that the accident may have been occasioned by one or two of several causes, and that the person complained of is responsible only for one of them, then the burden is on the plaintiff to show that the accident and resulting damages were produced by the cause for which the person complained of is responsible, and in case of a failure to establish such fact the plaintiff must fail in the action. In 29 Cyc. 625, it is said: 'The evidence must, however, do more than merely raise a conjecture or show a probability as to the cause of the injury, and no recovery can be had if the evidence leaves it to conjecture which of two probable causes resulted in the injury, where defendant was liable for only one of them.' "

The authorities in support of the rule are, substantially, unanimous, and may be found in the judicial decisions of

every jurisdiction in the country. It remains to be seen whether they are applicable to the facts in the case at bar. Passing for the moment the testimony. of appellant's expert witnesses, we will briefly review the material facts. There is evidence to support the theory that deceased was in the discharge of his duty as brakeman when the accident occurred which resulted in his death. The train he was on was running at the rate of 25 or 30 miles an hour, or more, as it passed through Tecoma where the accident occurred. He was last seen as the train was passing through Tecoma hanging on the side of either the first or second car from the engine, holding on to the grabiron or ladder with his feet in the stirrup. He was leaning out, apparently looking down, as if for a hot-box, whether looking forward or backward the witness could not tell as he only got a glimpse of deceased. About a half or three quarters of an hour after the train passed through Tecoma deceased's body was found with his head against the north rail of the side track near the northeast corner of the box car, while his feet were pointed toward the east. It was a cold, frosty morning, and the point where the body fell was plainly marked on the ground, because the gravel had been thrown up at that point and the frost brushed off. From that point the body had slid to the point where it was found, brushing away the frost and leaving a trail of blood all the way along. The mouth, nose and ears of the deceased were bleeding, and from these, evidently, had come the blood found at the point where he fell and all along the trail to where the body was found. His mackinaw was over his head and had been torn in the back. Some buttons had been torn off his vest and others were broken. His face was slightly scratched and contained cinders. There was a red mark on his arm about two inches long, and one of his legs was black and blue about half way from his ankle to the knee. The back of his skull was badly fractured from a point half way between the base of the brain and the crown, the fractures extending more to the right than the left. The persons who discovered

the body immediately entered upon an investigation to determine whether or not the deceased had come in collision with the car on the side track. The north side and west end of the car were covered with frost to a depth of a quarter of an inch. There were no marks on either the side or end of the car to indicate that the frost had been brushed off or that anything had struck the car. They also observed that the frost had not been disturbed on the ground north of the point where the body lit, nor was there any blood on the car. There is some discrepancy in the evidence as to the distance between the top center of the north rail on the main line. On questions of this kind it is our duty to accept the evidence most favorable to the plaintiff. Hence, in considering this feature of the case, to the extent that it becomes material, we shall assume that the clearance between the cars on the main line and side track was approximately 2 feet and 3 inches, as contended by plaintiff.

As hereinbefore stated, as to the physical facts there is no dispute. The sole controversy is as to the inferences that may be drawn from the proven facts. The fact that the north side and west end of the car on the side track was covered with frost at the depth of a quarter of an inch when the body was discovered had not been brushed off or disturbed as it would have been had it been struck by a body colliding therewith is to my mind practically conclusive of the controlling issue in the case, unless that condition can be explained so as to lead to a different conclusion without entering the domain of speculation and conjecture. If it had been made to appear that the frost had had ample time to reappear after the train passed and before the body was discovered the problem would be more difficult of solution. There is nothing in the record that aids us upon that point. There is not a single fact from which an inference may be drawn as to how long it would take the frost to collect again so as to appear the same as if it had not been brushed away. Even if such fact could be determined by one skilled in that department of science he would at

least have to know the temperature existing during the interval, and as to that there is not a syllable of evidence. There is evidence, however, tending to prove that it was not freezing when the body was discovered. It certainly is not a matter of common knowledge as to how long it will take frost to form, even in freezing weather. The circumstance of the frost being intact all over the north side and west end of the car, at a depth of a quarter of an inch, with no mark or sign of the body having struck the car at any point, is, to my mind, a circumstance that is humanly impossible to explain consistently with the appellant's theory of the accident. In the light of this undisputed fact, would it have been proper for the trial court to have submitted the case to the jury? Because the frost on the car was not disturbed, respondent assumes that deceased's body did not strike the car and that he must have lost his hold of the grabiron or ladder and been thrown to the ground at the point where it appears his body fell. As we read the evidence this theory of the accident is not inconsistent with any proven fact. Dr. Pace on being asked, "Could a skull be fractured as this skull was by a fall from the side of a railroad car 7 feet above the ground, the train traveling between 25 and 30 miles an hour and the ground covered with soft gravel?" answered "I am not able to answer that question; I don't know." Just what caused the deceased to fall from the side of the car will perhaps never be known. It is more probable that when deceased was last seen by the fireman, hanging on the side of the car, he was looking forward instead of backward. If such was the case, and he accidentally lost his hold, the natural tendnecy would be to fall more on his right side than on his left. That would probably account for a greater amount of fracture on that side of the head, as compared with the left side. Much stress is laid on the fact that blood was found where deceased fell as well as along the trail caused by the body sliding to the point where it stopped. Dr. Pace expressed the belief that the body was struck before it lit on the ground, because of blood being

found on the ground where the body lit. His theory was that as the skin was not cut and that it would take a little more time for the blood to find exit through the ears, mouth and nose that therefore deceased must have been bleeding when his body struck the ground. However, when a hypothetical question was put to him, involving the speed of the train, the weight of deceased's body, and the momentum of such a body as 6,875 pounds, the question also containing the inquiry whether if the skull hit the ground with such force it would cause the blood to instantly spurt from the nose and ears, he answered, "It might do; yes, sir." So that, after all, the reason given by Dr. Pace for his belief that the body must have been bleeding when it struck the ground is greatly weakened, if not completely destroyed, by his answer to the question last stated. Dr. Root was asked a hypothetical question involving the postion of the body when discovered, the bleeding at the eyes, ears, and nose, the fracturing of the skull, the sliding of the body 20 feet from where it lit, and the trail of blood all along commencing right at the point where the body lit and continuing to the point where it was discovered. The inquiry was, whether in his opinion the skull was fractured before the body hit the ground or after. He answered:

"I should say that the injury had occurred and the bleeding had begun prior to the time when the body began to slide and continued to bleed during the sliding process."

While he did not squarely answer the question propounded, yet, reduced to the last analysis, the answer was that the injury occurred and the bleeding commenced before the body began to slide. The answer is consistent with that of Dr. Pace, who testified, in answer to the hypotheses submitted, that in such case the blood might instantly spurt from the nose and ears.

The testimony of the physicians as to the tendency of an unconscious body to fall on its face and of the conscious body to fall in any conceivable direction, even if true, sheds

no light upon the question we have to determine. It is evident, in the instant case, that, whether conscious or unconscious at the time he fell, deceased did not fall on his face. The condition of the face when the body was found is irrefutable proof to the contrary. Neither did the body slide on its face from the point where it struck the ground to the point where it stopped, as the face was only slightly scratched. These, at least, are the conclusions which I have reached, and any other conclusions, in my opinion, would be contrary to the common knowledge of every rational being.

Turning again to the question of probabilities and improbabilities: It seems more probable that if the skull of the deceased had been struck by the end of the box car, or by the iron thereon, with the force engendered by the momentum of his body, the scalp would have been cut and the blood instantly have spurted from the wound; whereas, if he fell from the train onto the ground, as contended by respondent, there was less likelihood of the scalp being cut. This theory is entirely consistent with the condition in which the body was found. Furthermore, if he was struck by the end of the box car, or any projection thereon, his body would to some extent, have been retarded and the momentum with which he was moving would have been more or less diminished. In these circumstances, with his feet only 2 feet 2.25 inches above the ground, it seems improbable that his body would have moved forward through the air 20 feet before it struck the ground. These conjectures illustrate the contention of respondent that many different theories are deducible from the facts proven.

Another theory was advanced in the opinion of this court on the former appeal of the case. We quote from page 205 of the report (170 P. 85):

"Suppose he had come in contact with the car after he had lost his hold on the freight car on which he was riding, the proximate cause then would be the loosening of his handhold and falling from the

moving car. Coming in contact with the standing car would thus not constitute the proximate cause any more than the falling on the hard ground or on the ties, or any other object, would constitute the proximate cause of his death. We may therefore regard the evidence from any point of view, and the result is always the same, namely, that the cause of death is left wholly to conjecture."

This theory of the accident assumes that the body of deceased struck the car on the side track, and to that extent is consistent with the theory of appellant; nevertheless, the defendant, under the issues made by the pleadings, would not be liable for the deceased's death. The theory that deceased may have lost his hold or slipped and fell is not only consistent with the facts proven, but is recognized by numerous adjudicated cases. The railroad men, witnesses in the case, testified that the manner in which deceased was standing on the side of the car was extremely dangerous when a train is moving rapidly. One of the cases cited by respondent is an apt illustration and of sufficient importance to quote from at considerable length. In *Weckter* v. *Great Northern Railway Co.*, 54 Wash. 203, 207, 102 P. 1053, the court, at page 1054, said:

"It seems to us that the appellant failed to make out a prima facie case in the first instance. The testimony left the cause of death a mere matter of speculation and conjecture. Before reaching a verdict the jury would have to find, or rather assume, that the engine or train crashed into the car upon which the deceased was standing, and that such crash was the cause of his death. There is certainly no direct testimony in the record tending to sustain such a finding. If the death of appellant's intestate could only be accounted for through such a crash as that testified to by the several witnesses, there might be some reason or necessity for submitting the case to the jury; but it is a matter of common knowledge that trainmen meet their death every day by slipping or falling from cars, and that such hazards are incidental to their employment. There are numerous cases in this court where the circumstantial evidence on the part of the plaintiff tended to show the cause of the injury or death with even greater certainty or probability than does the testimony in this record; but in each case this court held that a recovery was unwarranted. *Hansen* v. *Seattle Lumber Co.*, 31 Wash. 604, 72 P.

457; *Armstrong* v. *Cosmopolis,* 32 Wash. 110, 72 P. 1038; *Reidhead* v. *Skagit County,* 33 Wash. 174, 73 P. 1118; *Stratton* v. *Nichols Lumber Co.,* 39 Wash. 323, 81 P. 831, 109 Am. St. Rep. 881; *Stone* v. *Crewdson,* 44 Wash. 691, 87 P. 945; *Peterson* v. *Union Iron Works,* 48 Wash. 505, 93 P. 1077; *Olmstead* v. *Hastings Shingle Mfg. Co.,* 48 Wash. 657, 94 P. 474; *Whitehouse* v. *Bryant Lumber Co.,* 50 Wash. 563, 97 P. 751. The same rule obtains and is firmly established in other jurisdictions. *Searls* v. *Manhattan Ry.,* 101 N. Y. 661, 5 N. E. 66; *Grant* v. *Pa. Ry.,* 133 N. Y. 657, 31 N. E. 220; *Tyndale* v. *Old Colony Ry.,* 156 Mass. 503, 31 N. E. 655; *Borden* v. *D. L. & W. R. Co.,* 131 N. Y. 671, 30 N. E. 586; *Cumberland Ry.* v *State,* 73 Md. 74, 20 A. 785, 25 Am. St. Rep. 571; *Sorenson* v. *Menasha Paper Co.,* 56 Wis. 338, 14 N. W. 446; *Manning* v. *Ry. Co.,* 105 Mich. 260, 63 N. W. 312; *Patton* v. *Texas & Pacific Ry. Co.,* 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361."

Respondent quotes from numerous adjudicated cases, all more or less in point, to the effect that no legitimate inference can be drawn that an accident happened in a certain way by simply showing that it might have happened in that way, without further showing that it could not reasonably have happened in any other way. Tested by this rule plaintiff in the instant case failed to prove defendant's liability for the accident. It is unnecessary to cite the cases relied on by respondent from other jurisdictions, as the cases cited in the opinion on the former appeal amply support respondent's contention. The Utah cases cited are *Quinn* v. *Utah Gas., etc., Co.,* 42 Utah, 113, 129 P. 113, 43 L. R. A. (N. S.) 328; *Edgar et al.* v. *Rio Grande Western R. Co.,* 32 Utah, 330, 90 P. 945, 11 L. R. A. (N. S.) 738, 125 Am. St. Rep. 867; *Busse* v. *Murray M. & L. Co.,* 45 Utah, 596, 147 P. 626; *Fritz et al.* v. *S. L. & O. G. & E. Co.,* 18 Utah 493, 56 P. 90. These cases are in strict harmony with the general rule. While the case at bar is controlled by the federal Employers' Liability Act, as interpreted by the federal courts, it is only necessary to say the federal decisions cited are also in harmony with the general rule. *Patton* v. *T. & P. Ry.,* 179 U. S. 658, 21 S. Ct. 175, 45 L. Ed. 361; *Severn* v. *P. & R. Ry. Co.* (C. C. A.)

281 F. 784, in which it was said: "The fact of injury, of course, is not evidence of negligence; nor is the possibility that the injury might have occurred in one of four ways proof that it did * * * not occur in some other way." See also, *Smith* v. *P. & R. Ry. Co.* (C. C. A.) 3 F. (2d) 604; *Southern Pacific Co.* v. *Johnson* (C. C. A.) 66 F. 559. The federal decisions go even further and hold that the doctrine of res ipsa loquitur does not apply. *Midland Val. R. Co.* v. *Fulgham* (C. C. A.) 181 F. 91, L. R. A. 1917E, 1; *Patton* v. *Ill. Cent. Ry. Co.* (C. C.) 179 F. 533.

The above cases sufficiently illustrate the rule adopted by the federal courts.

Respondent also contends that the decision of the court on the former appeal is the "law of the case" and should be applied. We are of opinion that the rule might well be applied on this appeal, but we have not deemed it necessary to make the application.

It is contended by appellant that new and different evidence was submitted to the court in the last trial of the case. For that reason we have not relied on the former decision as the law of the case, but have based our conclusions solely upon the evidence produced at the last trial.

Without regard to whether or not the defendant was negligent in maintaining its side track in close proximity to the main line of its railroad, we are of opinion that plaintiff failed to show that any negligence of defendant was the proximate cause of the death of deceased.

Appellant relies on cases referred to in appellant's brief on the former appeal. Also, *Stam* v. *Ogden Packing & Provision Co.*, 53 Utah 248, 177 P. 218, *Malizia* v. *O. S. L. R. Co.*, 53 Utah 122, 178 P. 756, and *Perrin* v. *U. P. Ry. Co.*, 59 Utah 1, 201 P. 405.

There was no error in granting the nonsuit and dismissing the action, and we find no error in the record.

Judgment affirmed, at appellant's costs.

CHERRY, STRAUP, HANSEN, and GIDEON, JJ., concur.