[No. 27260. *En Banc.* June 13, 1939.]

ORLENA BERGAGNA, *Appellant,* v. THE DEPARTMENT OF
LABOR AND INDUSTRIES *et al., Respondents.*[1]

*Kenneth Durham,* for appellant.

*The Attorney General, J. A. Kavaney* and *T. H. Little, Assistants,* for respondent Department of Labor and Industries.

*Stanbery Foster,* for respondent Cle Elum Coal Company.

[1]Reported in 91 P. (2d) 551.

GERAGHTY, J.—Batista Bergagna, a coal miner sixty-one years of age, suffered a heart attack while at work in a mine operated by the Cle Elum Coal Company. Succeeding the attack, he walked unassisted some two hundred feet up a fourteen per cent slope to the mouth of the mine, and died within a few minutes thereafter.

Orlena Bergagna, the workman's widow, filed a claim for pension with the department of labor and industries. The claim was rejected by the supervisor of industrial insurance for the assigned reasons that there was no proof of an injury to the decedent during the course of employment, and that death was not the result of trauma, as defined by the workmen's compensation act. The widow applied for and was granted a rehearing before the joint board of the department. At this hearing, the decision of the supervisor denying her claim was approved. On appeal to the superior court, the departmental decision was affirmed. The case is before us on claimant's appeal from the judgment of the superior court. The employer, Cle Elum Coal Company, was permitted to intervene in the lower court, and appeared in this court as an additional respondent.

The decedent reported for work at the mine at seven o'clock on the morning of the day on which he was stricken. His work was to get out coal from a "room" off the entry or haulage way through which the coal was drawn in cars to the surface. In his work, he ordinarily used pick and shovel, but, about ten o'clock, he borrowed a wedge and sledge hammer from a fellow miner for use where the pick could not be employed. The extent to which he used the sledge, which weighed nine pounds, is uncertain from the record, but the miner from whom it was borrowed testified that he thought it was used for a short period.

Adolph Leske, one of the miners working with the decedent, testified that, at about 11:30, he saw him, and that he was on his knees and doubled up.

"I asked him what was the matter, and I said, 'Are you sick, Bob?' He said, 'Yes.' I said, 'What is the matter?' He said, 'My stomach is bothering me.' And I said, 'It must be something you ate,' and he said, 'Yes,' and then I left him, and I went up to see what he was doing there at the face, and he had a prop on the ground with a saw on it and the saw was in there about an inch and in the meantime I sawed this prop off and put it up and I looked around and Bob was gone, he walked outside. . . ."

A few minutes later, the witness was told that Bergagna was dying,

". . . so we went out to see him in the outside engine house and Bob was propped up against a wall there, . . . and I looked at him then and he was a dead man then."

This was between ten and fifteen minutes after the witness had spoken to the decedent.

In the course of the testimony of this witness before the joint board, he referred to an incident which occurred earlier in the morning, between seven and eight o'clock. Being asked if he noticed anything unusual about the work the decedent did that morning as compared with other days, he stated:

"There was one time I came in there and Bob Curry was inside. We left two or three stumps because the coal was croppy, no good for nothing, so we left them, and I just happened to come in there and Bob was in there and I looked at Bob and Bob was mining some coal out and he didn't put a prop in and a couple cars of rock came down, and Bob was inside, and finally he came out and said, 'By God, it pretty near scared me to death,' and that was the only thing unusual excepting when Bob died."

Later, in the course of his testimony, this witness said that, instead of two car loads of rock falling down, only about five hundred pounds fell.

The decedent was known as "Bob." Robert Curry, the operator of the coal mine, was also spoken of as "Bob." The respondent company makes some contention that it is to be inferred from the witness's testimony that Curry was the Bob referred to as making the quoted statement. It is clear, however, from the context that the witness referred to the decedent, and this was the opinion of the trial court.

Dr. W. H. Orr testified that an autopsy performed by him disclosed that the decedent had had a fatty degeneration of the heart and chronic myocarditis of long standing. He also had hardening of the arteries. The immediate cause of death was acute heart failure. He made a complete examination of the body and found no marks or any evidence of any injury from without. Asked by the department's examiner what would bring on the acute attack which finally killed decedent, the witness answered:

"Sometimes those things are brought on simply by worry or excitement without any muscular strain of any kind. It is possible to have heart failure; some people die just in a fit of fear, you know—acute fright or fear will bring it on just the same as any exertion would. Exertion wouldn't be any more apt to do it than fear, or fright, or worry or anything of that kind for that matter, with the kind of a set-up he had."

Dr. Nathan K. Rickles, a physician in general practice, called by the claimant, in answer to a hypothetical question embracing the case history of the decedent, gave it as his expert opinion that, in the case of a man of decedent's age, with the objective finding of heart disease disclosed by the autopsy, coupled with the falling of a quantity of rock in his near vicinity,

occasioning a sudden fright and raising of his blood pressure, the heart might easily become dilated sufficiently to cause either immediate death or a weakening of its muscles to the extent that any undue or continued strain thereafter might cause death.

The claimant testified that neither she nor the decedent had been aware of the diseased condition of his heart.

■ This case is one of a class which courts have found not easy of solution. Our own decisions have accepted the rule that an accident arises out of the employment, under the terms of the workmen's compensation act, when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of the man's health. *Frandila v. Department of Labor & Industries,* 137 Wash. 530, 243 Pac. 5; *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821; *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218; *Daugherty v. Department of Labor & Industries,* 188 Wash. 626, 63 P. (2d) 434; *Devlin v. Department of Labor & Industries,* 194 Wash. 549, 78 P. (2d) 952.

The English statutes providing for compensation to workmen injured in industry were among the earliest in that field of legislation, and, as a consequence, the decisions of the English courts construing them have, to a degree, influenced the trend of opinion in American courts. In *Frandila v. Department of Labor & Industries, supra,* Judge Mackintosh, speaking for the court, quoted at some length from the case of *Clover, Clayton & Co. v. Hughes,* 26 Times L. R. 359. In that case, the facts were that a workman, while engaged in tightening a nut with a spanner, strained himself and thereby ruptured an aneurism of the aorta, which caused his death. A post-mortem examination showed

that the aneurism was in such an advanced condition that it might have burst while the man was asleep, and that very slight exertion or strain would be sufficient to bring about a rupture. In announcing his conclusions, Lord Chancellor Loreburn made the following comment pertinent to the question before us:

"I do not think we should attach any importance to the fact that there was no strain or exertion out of the ordinary. It is found by the County Court Judge that the strain in fact caused the rupture, meaning, no doubt, that if it had not been for the strain the rupture would not have occurred when it did. If the degree of exertion beyond what is usual had to be considered in these cases, there must be some standard of exertion, varying in every trade. Nor do I think we should attach any importance to the fact that this man's health was as described. If the state of his health had to be considered, there must be some standard of health, varying, I suppose with men of different ages. An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of health.

"It may be said, and was said, that if the Act admits of a claim in the present case, every one whose disease kills him while he is at work will be entitled to compensation. I do not think so, and for this reason. It may be that the work has not, as a matter of substance, contributed to the accident, though in fact the accident happened while he was working. In each case the arbitrator ought to consider whether, in substance, as far as he can judge on such a matter, the accident came from the disease alone, so that, whatever the man had been doing, it would probably have come all the same, or whether the employment contributed to it. In other words, did he die from the disease alone, or from the disease and employment taken together, looking at it broadly. Looking at it broadly, I say, and free from overnice conjectures, was it the disease that

did it or did the work he was doing help in any material degree?"

Here, the workman collapsed, while engaged in heavy muscular work, a relatively short time after he had experienced some shock or fright as the result of the fall of a mass of rock from the roof of the mine, in close proximity to him. Considering the condition of his heart, as developed by the autopsy, it hardly requires the testimony of medical men to establish that the man's collapse could have been, and, indeed, in all probability was, precipitated by the degree of exertion required for his work, even if the effect of shock or fright be eliminated. True, he could have died in bed or away from the mine. But he did not die in bed. He was stricken in the mine while engaged in work that admittedly could subject his heart to a strain beyond its capacity to withstand. Putting the question in the words of the cited English case:

"Looking at it broadly . . . and free from overnice conjectures, was it the disease that did it, or did the work he was doing help in any material degree?"

Our answer is that the work the decedent was doing helped in a material degree to cause his death. In reaching this conclusion, we have not overlooked the statutory rule that, in all court proceedings, the decision of the department shall be *prima facie* correct, and that the burden of proof is upon the party attacking the same. We think the burden of proof has been met by the appellant.

The judgment is reversed, and the cause remanded to the superior court for further proceedings not inconsistent with the views expressed in this opinion.

BLAKE, C. J., MAIN, MILLARD, and JEFFERS, JJ., concur.

SIMPSON, J. (dissenting)—I am unable to subscribe to the result reached by the majority.

At the outset, it is necessary to determine the meaning of the word "injury" as used in the workmen's compensation act of this state.

Laws of 1921, chapter 182, p. 720, § 2, Rem. Comp. Stat., § 7675, defined a compensable injury as follows:

"The words 'injury' or 'injured' as used in this act refer only to an injury resulting from some fortuitous event as distinguished from the contraction of disease."

In 1926, two cases involving claims under the workmen's compensation act for injuries occasioned by fortuitous events were decided by this court.

In *Frandila v. Department of Labor & Industries,* 137 Wash. 530, 243 Pac. 5, a workman suffering from hardening of the arteries, collapsed and died while chopping a root at the bottom of a ditch, and this court allowed the widow's claim for compensation.

In *Cole v. Department of Labor & Industries,* 137 Wash. 538, 243 Pac. 7, a workman, afflicted with a diseased heart and arteries, while exerting practically all of his physical strength in piling heavy timbers, suffered a rupture in the region of his heart, and a temporary total disability. This court found the claimant was injured by a fortuitous event, and that his injury was compensable under the act.

The 1927 legislature, evidently having in mind the two above mentioned cases, changed the definition of "injury," by § 2, Laws of 1927, chapter 310, p. 815, Rem. Rev. Stat., § 7675, to read:

"The word 'injury' as used in this act means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom."

The foregoing definition of the word "injury" was reenacted by the 1929 legislature, Laws of 1929, chapter 132, p. 325, § 1, Rem. Rev. Stat., § 7675 [P. C. § 3470], and still obtains.

This court recognized the changed meaning of the word "injury" when the following statement was made in *Pellerin v. Washington Veneer Co.*, 163 Wash. 555, 2 P. (2d) 658:

" 'Traumatic' is defined by Webster as 'a wound; of or pertaining to wounds; applied to wounds.' The words in the act of 1927, defining injury, referring to a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, therefore undoubtedly mean some blow or wound, suddenly and tangibly happening, producing an immediate or prompt result as opposed to something in the nature of occupational disease with which we dealt in the *Seattle Can Co.* decision, *supra* [147 Wash. 303, 265 Pac. 739].

"The manifest intention of the legislature in the enactment of the new definition of injury was to make more certain the definition of injury and make it apply strictly to sudden and tangible happenings occurring from without of a traumatic nature producing an immediate or prompt result, as distinguished from anything like an occupational disease."

The meaning of the present definition and its application was under consideration in *Flynn v. Department of Labor & Industries*, 188 Wash. 346, 62 P. (2d) 728, in which case Judge Tolman, speaking for the court, said:

"The statute is in no respects ambiguous or uncertain. It is plain, clear, concise, and is therefore not subject to construction, but the language used must be given its plain and ordinary meaning. Had it been the legislative intent to cover every kind of physical impairment occurring while a workman was in the course of his employment, it might very easily have

employed language to express that intent, but it did not do so.

"The statute, segregated into its component parts, indicates very clearly that first, there must be a 'happening;' second, the happening must be of a 'traumatic nature;' and third, the happening must occur 'from without.'

"It seems apparent that the two phrases, 'of a traumatic nature' and 'occurring from without,' both modifying as they do, the word 'happening,' can only mean that there must be an external act or occurrence which caused the injury and that such act or occurrence must be 'of a traumatic nature.' The source as well as the nature or character of the 'happening' are both determinative factors under the statutory definition.

"In this case, the source or cause of the physical impairment of the deceased workman did not occur outside his body or 'from without.' According to the admitted facts, he called, swallowed some tobacco, coughed, strangled, and from the coughing a fatal strain was placed upon his heart. The cause therefore originated within and not without the body. But, even if there was anything without the body in the origin of the cause, then that which was without was not 'of a traumatic nature.'

"If there was a quick intake of breath following the calling, then air only entered, and air entering through natural passages and in a natural way cannot be a 'happening of a traumatic nature.'

"There was then no 'happening of a traumatic nature . . . occurring from without.' Therefore, there was no 'injury' within the contemplation of the statute."

We must consider whether the facts and the record as made bring this case within the statutory definition of "injury." There was no definite proof in this case that the deceased used the sledge or wedge during the day of his death, but, on the other hand, his fellow workmen testified that his work on that day was the usual work engaged in by the workers in the coal

mine. The only thing that occurred out of the ordinary was the fall of dirt and rock, and one witness, a coal miner working in the mine with the deceased, testified that dirt and rock fell frequently.

The majority opinion stresses the fact that Bergagna was scared when the rock or dirt fell. This statement, "By God, it pretty near scared me to death," was at most a self-serving declaration and one frequently used by many people concerning the happening of minor occurrences in everyday life. It is to be observed that Bergagna did not show any ill effects from the scare and continued his work for a considerable time thereafter.

The following testimony of Dr. Orr indicates his conclusions:

"Q. Doctor, your opinion is it would require some unusual strain, then, to bring on a heart attack? A. Or unusual excitement, either nervous or physical, although sometimes it comes on as has been mentioned even when they are asleep. We had one case just here in town that died with the same type of heart attack, while he was sleeping. Q. Do you think a man doing his ordinary work he had been accustomed to doing for a good many years and had nothing unusual occur on that particular day would be particularly apt to have a heart attack at that type of work? MR. DURHAM: Objected to unless he had a heart such as this man had. Q. (continuing) And assuming he had such a heart as you found on your autopsy? A. There would be no more reason to believe he would have one that day than he had previously unless he was more excited or under different conditions than he had been under, but this man I mentioned a while ago who died while he was asleep, was a man accustomed to heavy work right along, still he died while he was under no exertion at all. He died while he was sleeping, and the family all around. He went in there and had been perfectly all right a few minutes before, and then they found he was dead. Q. Doctor, then, do you think the ordinary work the man was accustomed to

doing and was doing on the day he died contributed to his death? . . . A. Yes; there wouldn't be any more reason, as I said before, for him to have an acute attack on that day than he would have had previously doing the same type of exertion."

It is true, however, that Dr. Orr did not have the benefit of the testimony of the workmen concerning the fright occasioned to decedent by the falling of rock and dirt, because that evidence was introduced subsequent to the giving of his testimony.

The only evidence upon which a finding of liability may be grounded is that of Dr. Rickles, in which he stated that the fright resulting from the falling rock and dirt probably was the cause of Bergagna's death.

When an employee becomes ill or dies during the time he is employed, and there is no unusual happening in the course of his work, nor marks of external violence to his person, nor any showing of any sudden or looked-for occurrence in the course of his work calling for extra exertion or strain other than that required by his usual and ordinary labor for the day, he has not suffered an injury within the meaning of our workmen's compensation act. It will readily be admitted that the application of the act is not limited to those who are in a state of physical perfection and free from any physical infirmities.

The remaining cases cited and relied upon by the majority, namely, *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821; *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218; *Daugherty v. Department of Labor & Industries,* 188 Wash. 626, 63 P. (2d) 434; and *Devlin v. Department of Labor & Industries,* 194 Wash. 549, 78 P. (2d) 952, all involve factual situations in which the workman experienced unusual and extraordinary exertion in the pursuit of his work, resulting in a con-

dition of physical exhaustion. These essential factors are not present in the case at bar.

In the case of *O'Toole v. Department of Labor & Industries,* 182 Wash. 202, 46 P. (2d) 388, the court made the following observations which are peculiarly pertinent to the instant case:

"There is medical testimony on behalf of the respondent to the effect that, though in a serious physical condition for some time prior to his death, heavy physical labor and strain might be a contributing factor; and that, if the deceased had been at rest instead of engaged in labor on the morning referred to, his death might not have occurred at that time. The dominant thought running through all of this testimony appears to be to the effect that the deceased might have died at any time, but that the chances in favor of death would be increased by hard labor. Or, in other words, that one afflicted as was the deceased would be more likely to die while doing heavy manual labor than he would if he remained at ease. . . .

"We find from the whole record no convincing proof which will support the findings of fact as to the cause of death which we have quoted. It is true that the record shows that the work of a choker setter is hard physical labor. If deceased in the earlier morning hours had been so engaged, he afterwards had a resting spell while the truck was being loaded just before the time of his death. After that resting spell, he had set the choker but once. There is nothing to indicate that there was anything violent and strenuous about his exertion in so doing, and even though it be presumed that he labored heavily in that last setting of the choker, still the evidence as a whole does not indicate that such exertion was the proximate cause or even contributed to the death which followed within a few minutes thereafter."

Rem. Rev. Stat., § 7697 [P. C. § 3488], provides:

"In all court proceedings under or pursuant to this act the decision of the department shall be *prima facie* correct and the burden of proof shall be upon the party attacking the same."

It is the settled law in this state that, when a complainant appeals to the courts, he assumes and must meet the burden of proving that the person claimed to have been injured sustained an injury compensable under the statute. *Marney v. Industrial Ins. Department,* 98 Wash. 483, 167 Pac. 1085; *Kavaja v. Department of Labor & Industries,* 126 Wash. 284, 218 Pac. 196; *Boyer v. Department of Labor & Industries,* 160 Wash. 557, 295 Pac. 737; *Frich v. Department of Labor & Industries,* 169 Wash. 282, 13 P. (2d) 67; *Zoff v. Department of Labor & Industries,* 174 Wash. 585, 25 P. (2d) 972; *Mecartea v. Department of Labor & Industries,* 176 Wash. 27, 28 P. (2d) 257; *Schraum v. Department of Labor & Industries,* 197 Wash. 336, 85 P. (2d) 262; *Hoff v. Department of Labor & Industries,* 198 Wash. 257, 88 P. (2d) 419; *Matson v. Department of Labor & Industries,* 198 Wash. 507, 88 P. (2d) 825; *Ferguson v. Department of Labor & Industries,* 197 Wash. 524, 85 P. (2d) 1072, 90 P. (2d) 280.

Many cases could be assembled in which an employee had some kind of heart disease and died while working or a short time after he became ill on the job, and in which the courts of this country have denied recovery unless it was shown by the evidence an injury was suffered which had a direct relation between the accident and the subsequent death of the employee. The following are illustrative: *Standard Oil Co. v. Industrial Commission,* 322 Ill. 524, 153 N. E. 660; *Johnson v. Mary Charlotte Mining Co.,* 199 Mich. 218, 165 N. W. 650; *Longobardi v. Sargent & Co.,* 100 Conn. 383, 124 Atl. 13; *Chief Consol. Mining Co. v. Salisbury,* 61 Utah 66, 210 Pac. 929; *Fetrow v. Oliver Farm Equipment Sales Co.,* 132 Pa. Super. Ct. 39, 1 Atl. (2d) 249; *Rowe v. Goldberg Film Delivery Lines,* 50 Ariz. 349, 72 P. (2d) 432; *Lyons v. Fox New England Theatres,* 112 Conn. 691, 153 Atl. 778.

In every case, a causal connection must be shown between the accident and the claimant's condition. In other words, the effect disclosed by the employee's condition must have been caused not by mere illness, but by an actual injury traceable directly to an accident received while in employment. *Lexington R. System v. True,* 276 Ky. 446, 124 S. W. (2d) 467.

Awards must be based upon competent proof and not upon possibilities or conjecture.

In the case of *Alexandria Metal Products Co. v. Newsome,* 97 Ind. App. 420, 185 N. E. 520, the appellate court of Indiana, sitting *En Banc,* said:

"In determining the question presented we must bear in mind that the burden of establishing each fact necessary to a legal award of compensation rests upon the person, or persons, seeking such compensation, and such burden must be discharged by proof of facts, and the finding of facts must be based on something more than mere guess, conjecture, surmise, or possibility."

The above quoted portion of the decision was recently cited with approval in *Nichols v. Winslow Coal Corp.,* 18 N. E. (2d) (Ind. App.) 475.

See, also, *Ralph H. Simpson Co. v. Industrial Commission,* 337 Ill. 454, 169 N. E. 225; *Chicago & N. W. R. Co. v. Industrial Commission,* 341 Ill. 131, 173 N. E. 161; *Sanitary Dist. of Chicago v. Industrial Commission,* 343 Ill. 236, 175 N. E. 372; *Plano Foundry Co. v. Industrial Commission,* 356 Ill. 186, 190 N. E. 255; *Black, Sivalls & Bryson v. Silvey,* 86 P. (2d) (Okla.) 327; *John A. Roebling's Sons Co. v. Industrial Acc. Commission,* 36 Cal. App. 10, 171 Pac. 987; *Davis v. Fowler Packing Co.,* 101 Kan. 769, 168 Pac. 1111; *Dube's Case,* 226 Mass. 591, 116 N. E. 234; *Ginsberg v. Burroughs Adding Machine Co.,* 204 Mich. 130, 170 N. W. 15; *Ferst v. Dictograph Products Corp.,* 193 App. Div. 564, 184 N. Y. Supp. 422; *Vale v. State In-*

*dustrial Acc. Commission,* 86 P. (2d) (Ore.) 956; *Brooke v. Nolan,* 87 P. (2d) (Idaho) 470; *Tremelling v. Southern Pac. Co.,* 70 Utah 72, 257 Pac. 1066; *Neale v. Weaver,* 88 P. (2d) (Idaho) 522.

In cases where the injury might or could have been occasioned by either disease or accident, the claim must fail in the event the proof is insufficient to establish an injury within the meaning of the act, and where, under the evidence, the cause of death is equally consistent with an accident and with no accident. *Illinois Bell Tel. Co. v. Industrial Commission,* 325 Ill. 102, 156 N. E. 319; *Madison Coal Corp. v. Industrial Commission,* 320 Ill. 298, 150 N. E. 645; *White v. Spencer Cardinal Corp.,* 19 N. E. (2d) (Ind. App.) 866; *Choctaw Gin Co. v. Reese,* 87 P. (2d) (Okla.) 1091; *John A. Roebling's Sons Co. v. Industrial Acc. Commission, supra; Standard Oil Co. v. Industrial Commission, supra.*

Whether there was causal connection between decedent's physical condition and the employment and the moving cause of death, are essential questions of fact to be determined from the evidence adduced at the hearing before the board. There are some simple disorders with which all persons are familiar, and many injuries which occur are patent and capable of understanding by the layman. The effect of injuries or disease to the heart, lungs, or other internal organs of a person can only be ascertained and testified to by those trained in the medical profession. In order to show whether the death results from an injury, as defined by our statute, it is necessary to obtain the evidence of skilled and professional persons to determine its cause. *Kavaja v. Department of Labor & Industries, supra; Stevich v. Department of Labor & Industries,* 182 Wash. 401, 47 P. (2d) 32; *Cooper v.*

*Department of Labor & Industries,* 195 Wash. 315, 80 P. (2d) 830.

In the *Kavaja* case, *supra,* this court said:

"While the testimony of appellant and other non-expert witnesses has some bearing on the question involved, yet, in the main, the actual facts must be determined from the testimony of the medical witnesses."

The supreme court of Oklahoma, in speaking on this subject in *Oklahoma Natural Gas Co. v. White,* 85 P. (2d) (Okla.) 756, said:

"The record reveals that the respondent had been afflicted with pulmonary tuberculosis for a number of years prior to the alleged accident, and immediately thereafter he ceased working and was declared by physicians to be totally disabled as a result of said disease. There is also evidence in the record showing that the respondent had the hemorrhage while lifting the desk as alleged.

"If the award is to be sustained the evidence must show a causal connection between the act of lifting the desk and respondent's present disability, and this must be established by skilled and professional men. The question thus to be determined is whether the respondent was rendered disabled as an immediate result of lifting the desk or merely as a result of tuberculosis. If the lifting accelerated the disease then dormant to the point of disabling respondent his injury was compensable. *Skelly Oil Co. v. Rose, supra* [176 Okla. 313, 55 P. 2d 1019]; *Oklahoma Furniture Mfg. Co. v. Washington, supra* [180 Okla. 381, 70 P. 2d 69].

"Two physicians testified that a strain caused by heavy lifting might make active or hasten tuberculosis, but there is no medical testimony to show that claimant's disease was actually dormant at the time the desk was lifted, or to reasonably indicate that the lifting, by hastening the illness, had concurrently or at sometime thereafter put an end to respondent's ability to perform labor. There is no such evidence to show

that the tuberculosis had not reached an advanced and disabling stage prior to or at the time of the alleged accident. In other words, the evidence shows no causal connection between the act of lifting the desk and the later tubercular condition. The burden to establish this connection by expert testimony was on the respondent."

The evidence of the doctors in the instant case wholly failed to show any causal connection between the injury, conceding for the purpose of argument that there was one, and the death. The testimony of Dr. Rickles to the effect that the falling debris was probably the cause of decedent's death cannot be accorded very much weight, for the reason that it stated a mere probability and was given in answer only to a supposititious question without any actual knowledge of the decedent's physical condition obtained through a personal examination of him.

It will be observed that the majority opinion has been influenced materially by the English case of *Clover, Clayton & Co. v. Hughes,* 26 Times L. R. 359, decided by the House of Lords with three Lords constituting the majority and with two Lords dissenting. That case was cited with approval in the case of *Frandila v. Department of Labor & Industries, supra,* a case which was decided in 1926 before the statutory definition of the word "injury" was changed in this state. Several other English cases are also cited in the cases from this jurisdiction relied upon by the majority.

The English cases cited involve and construe either chapter 58, 6 Edw. 7 (1906), or chapter 84, 15 & 16 Geo. 5 (1925).

Chapter 58, 6 Edw. 7 (1906), reads in part:

"If in any employment personal injury by accident arising out of and in the course of the employment is caused to a workman, his employer shall, subject as

herein-after mentioned, be liable to pay compensation in accordance with the First Schedule to this Act."

Chapter 84, 15 & 16 Geo. 5 (1925), reads in part:

"If in any employment personal injury by accident arising out of and in the course of the employment is caused to a workman, his employer shall, subject as hereinafter mentioned, be liable to pay compensation in accordance with the provisions hereinafter contained: . . .

"The compensation shall be payable to or for the benefit of the workman, or, where death results from the injury, to or for the benefit of his dependents as provided by this Act."

Neither of these English statutes defines either "accident" or "injury," and the determination of what constitutes an injury or accident has been reserved for judicial construction. Hence, the English cases, even conceding they may possibly have carried some weight in respect to the situation now before us prior to the definition of "injury" by the 1927 and 1929 sessions of the legislature, are now of very little value in determining this question, because of the explicit language of our act expressly defining "injury."

In the case of *Clover, Clayton & Co. v. Hughes, supra,* the House of Lords allowed recovery when death resulted from the doing of just ordinary work which occasioned a strain; but since the evidence in the present case does not show the decedent suffered a strain, that case is inapplicable here. In any event, under the statutory definition of "injury" in this state and the decisions of this court thereunder, the occurrence of death in the course of employment is insufficient to entitle one to an award under the act. In order to obtain an award in cases similar to the one at bar, it is essential that a showing of extraordinary exertion be made. Moreover, in the above cited English case, the evidence was conflicting, but the county

court judge found the decedent suffered a strain which contributed to his death. The Lord Chancellor stated:

"In the present case I might have come to a different conclusion on the facts had I been arbitrator, but I am bound by the finding, if there was evidence to support them."

An examination of many of the English cases arising under the English workmen's compensation acts shows that the House of Lords extends great deference to the findings of fact of the inferior British county courts; and in cases in which the evidence is almost evenly balanced, it does not interfere with the findings of fact of the lower court, even though the House of Lords might have reached another conclusion if it had considered the facts in the first instance. Likewise, this court, even though cases of this character are tried *de novo* here, should not substitute its judgment for that of the department unless the departmental finding is clearly against the weight of the evidence.

The recent English case of *Whittle v. Ebbw Vale Steel, Iron & Coal Co.,* 29 B. W. C. C. 179, is illustrative of many English cases of like import that might be assembled, and shows that the claimant must establish his claim by adequate proof in order to be entitled to an award. The House of Lords, speaking through Lord Justice Slesser, stated:

"If the facts which are proved give rise to conflicting inferences of equal degrees of probability so that the choice between them is a mere matter of conjecture, then, of course, the applicant fails to prove his case, because it is plain that the onus in these matters is upon the applicant."

In his memorandum opinion, the trial judge made a very able analysis of the facts and the conclusions

to be drawn therefrom. He made the following apt observations:

"The evidence shows that there was no fan in the mine; the ventilation depending on natural circulation of air. There was no injury to the body of decedent. The evidence shows that the use of the pick and shovel and the saw is the usual work of a miner, and while hard work, threw no unusual strain upon decedent that morning. It is not sufficiently severe but what the physical condition of decedent could adjust itself to it and acquire a tolerance for it. While work with the sledge and wedge, or lifting of heavy chunks of coal, would strain the body more, yet there is no testimony upon that score, that is, although at times that work may be engaged in, in course of employment, there is no evidence that decedent performed that labor in this case.

"Fall of rock was not unusual and would ordinarily affect a miner but slightly. Was this fall so large as to cause an unusual re-action in decedent? We have his statement that it frightened him. This occurred $3\frac{1}{2}$ or 4 hours before he left the mine.

"As counsel says in examination of the physician, this question is one for application of common sense, after we have the benefit of the knowledge and opinions of the experts.

"Any physical exertion may produce fatal results in a heart such as decedent possessed, but it is equally true that it will adjust itself so as to have a tolerance for usual labor. Fright may cause an increase in the heart beats and produce fatal results. And of course, fright accompanied by physical exertion increases the chance of a reaction on the heart.

"It is equally as true that the progress of the disease, or some internal physical disorder, altho temporary, may result in sudden death without exertion of any kind, at home, at work or any place. So that the mere fact that decedent was stricken while at work is not determinative of his right to recover, we must determine whether fright or physical strain caused death by operating upon a pre-existing diseased heart to that result.

"I think it is common sense to say that the longer the time that intervenes between the fright and the death, the more improbable it is that the fright contributed to the death. When we consider that miners are accustomed to having debris fall in the mine, and is therefore not as susceptible to fright as other individuals under the same circumstances, and the fact that so long a time elapsed before any change was indicated in the condition of decedent, reduces the question of the effect of this falling debris upon decedent to a question of theory rather than fact. There is no proof of unusual strain or over exertion, tangible to any analysis I can make of the testimony, that *did* produce the death. The fright and physical exertion *could have* produced the result but it is only by conjecture and inference that we could say that they *did* produce it.

"To say the least, I cannot hold that the decision of the joint board is error with that certainty that the *prima facie* presumption of its correctness requires."

The proof in this case is insufficient to show that the acts of employment in which deceased was engaged shortly before his death were other than the ordinary, usual work of a coal miner engaged in his usual and daily employment. The record does not establish that the falling of the debris was the probable cause of the decedent's death, nor was Bergagna's death caused by a sudden and tangible happening of a traumatic nature which produced an immediate and prompt result occurring from without.

I fully appreciate that the workmen's compensation act is remedial in its nature and must be construed liberally for the benefit of the workman and his dependents. However, the rights of claimant under the act are of statutory origin, and the court cannot extend them beyond the terms of the statute creating those rights and the reasonable inferences to be derived from the language of the statute. To hold that

relatives of a deceased employee may secure the benefits of the law when that employee dies on the job because of ordinary exertion and without the happening of an accident, makes for extrahazardous occupations a mecca for all ailing workmen who, by securing employment in occupations covered by the act, may obtain life insurance without the payment of premiums.

For the reasons given, I dissent.

ROBINSON, BEALS, and STEINERT, JJ., concur with SIMPSON, J.